UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

VICTOR P. KEARNEY,                                      No. 17-12274 t11

      Debtor.

## OPINION

Before the Court is confirmation of the Unsecured Creditor Committee's ("UCC's") Second Plan of Reorganization (the "UCC Plan"). The Court held a final hearing on confirmation on January 31 and February 1, 2019. Having considered the evidence in the record and the arguments of counsel, the Court finds and concludes that the UCC Plan complies with § 1129[1] and should be confirmed.

### I.    FACTS

The Court finds the following facts:[2]

### Creation of the Mary Pat Kearney Trusts

Benjamin and Pat Abruzzo developed the Sandia Peak Ski Area and the Sandia Peak Tramway, both owned by their company Alvarado Realty Company ("ARCO"). The Abruzzos died in a plane crash in 1985, survived by their children Louis, Benny, Richard, and Mary Pat. The children took over management of ARCO after their parents' death.

Mary Pat Abruzzo married the Debtor in 1988, when she was 22 years old. She executed a last will and testament on July 8, 1988.

---

[1] Unless otherwise noted, all statutory references are to 11 U.S.C.

[2] The Court took judicial notice of the docket in the main case and all adversary proceedings. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

Mary Pat Kearney died in 1997, age 31. At the time of her death, she owned about 18.5% of ARCO's stock. Under her will, the stock was bequeathed to two testamentary trusts (together, the "MPK Trusts") for the benefit of the Debtor during his lifetime. Upon Debtor's death, the corpus of the trusts is to be distributed to Louis, Benny, and Rich Abruzzo or their children.[3] Ms. Kearney's will appointed Louis and Benny Abruzzo (the "Abruzzos") and Debtor as co-trustees of the MPK Trusts. Debtor has since resigned.

*The State Court Action*

Despite substantial distributions from the MPK Trusts (about $800,000 per year or $16,000,000 in total), relations between the Debtor and the Abruzzos soured. In 2013, the Debtor sued the Abruzzos in New Mexico state court, cause no. D-202-CV-2013-07676 (the "State Court Action"), alleging that they had breached their fiduciary duties by, inter alia, suppressing dividends paid by ARCO to the MPK Trusts.[4] The Abruzzos later filed a counterclaim for breach of fiduciary duty, to modify the trusts, and for other relief. The action was assigned to the Hon. Alan Malott.

Judge Malott presided over a five-day jury trial of Debtor's claims against the Abruzzos in June and July 2015. On July 6, 2015, Debtor rested his case[5] and the Abruzzos moved for a directed verdict.[6] Judge Malott directed a verdict dismissing Debtor's claims against the Abruzzos. Judge Malott made the following findings of fact in open court:

> There has been no substantial evidence that the Abruzzos in fact control ARCO.
> . . . . I see no evidence of actual control.
> I don't find that the Abruzzos misused any control they may have had in this circumstance. The totality on which the entire Plaintiff's case rests is if it's good

---

[3] Richard Abruzzo died in December 2010.

[4] ARCO's policy was to dividend 70% of its profits and retain 30%.

[5] Debtor was scheduled to be cross examined on the afternoon of July 6, but failed to appear in court, complaining of medical problems.

[6] Part of the evidence upon which the Abruzzos relied, and which the Court finds significant, is that ARCO's dividend policy had been set before the Debtor married Mary Pat and had not changed after her death.

for ARCO, it must be bad for Victor Kearney. That's not the law; that's not the evidence in this case.

. . . . [T]he Abruzzos' efforts on behalf of ARCO . . . have been . . . extremely successful. . . . The fact that the Abruzzos have run their company properly does not translate into a starvation or a partiality on behalf of . . . ARCO over and against the interest of either Mr. Kearney or the remainder beneficiaries . . . . The appropriate totality appears to be in this situation, a rising tide lifts all the boats.

Kearney has made an increased distribution of over 800 percent through one of the worst recessions this country has ever seen . . . .

The Abruzzos do not control the board. There is not a single incident in which it was shown they had their way or forced their agenda onto anyone else . . . .

The fact that ARCO has grown as large over these last 15 years has . . . made the whole pie bigger and everybody's slice bigger. How that could translate to a reasonable jury into an award of damages of any particular amount, let along 7-some-odd million dollars, does not compute to the Court . . . .

The Abruzzos asked for attorney fees under N.M.S.A. § 46A-10-1004 ("In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award cost and expenses, including reasonable attorney fees, to any party…."). On December 22, 2015, Judge Malott ruled that justice and equity required that the Abruzzos recover $510,000 in fees, $35,700 in gross receipts tax, and $120,215.69 in costs. Judge Malott ordered the Debtor to pay 75% of these amounts, and the MPK Trusts to pay 25%.[7] The order contains the following:

> Plaintiff argues that Defendants should not be allowed to recover fees incurred in Defendants' opposition to his attempts to obtain corporate documents and information from ARCO, the separate, closely held, corporation involved in this matter but not a party hereto. A significant pillar of Plaintiff's case was his claim that his status as a Trustee and Life Income Beneficiary under his deceased wife's Trust entitled him to effect [sic] the management of ARCO from which the Trust's income flows. Another pillar was his claim that Defendants operated ARCO so as to profit ARCO more than the Trust and, therefore, to minimize income to Plaintiff. While Plaintiff was allowed to obtain some, but not all, the corporate information and documentation he sought, he was not successful in establishing his core charges that Defendants managed ARCO to his financial detriment. The fees incurred in context of the ARCO document discovery dispute are a reasonable and necessary part of this overall litigation.
> . . . .

---

[7] Judge Malott clarified in a subsequent order entered on April 20, 2016, that the portion of fees paid by the MPK Trusts should "be paid to Defendants by the Trusts from its current principal holdings."

While there is no substantial evidence that Plaintiff brought this action without at least an honest belief in the merits of this argument, it is also indisputable that Plaintiff was, after two (2) years of litigation, not able to support his allegations with substantial evidence at trial. While Plaintiff believes he "had legitimate claims against the Defendants" which "survived vigorous summary judgment motions" . . . . Plaintiff could not, and did not, prove those claims at trial.

On April 7, 2017, Judge Malott sanctioned Debtor $100,000, finding:

> Substantial evidence was adduced that Victor Kearney has engaged in significant dishonesty and made numerous false statements, both under oath and not, including but not limited to first claiming he and Mary Pat Abruzzo Kearney were domiciled in New Mexico at her death, then later claiming they were domiciled in Nevada; in his divorce proceedings, Mr. Kearney clearly falsely represented his income to gain an advantage in child support determination; in the first phase of trial in this case, Mr. Kearney testified that his obligations regarding state and federal income taxes were current when in fact he had not filed tax returns for a number of years.
>
> Substantial evidence was adduced that Mr. Kearney has also disobeyed and disregarded lawful Orders of this Court in this litigation including Orders directed at his discovery obligations as well as the specific Confidentiality Order, and verbal confidentiality instructions entered by the Court during the course of this litigation.
>
> Overall, Debtor has impressed the Court as an individual who bears no allegiance to the truth, but who will say whatever he thinks will achieve his goals. He has little or no credibility. Further, Debtor has repeatedly exhibited bad faith non-compliance with his discovery obligations throughout this litigation both generally and by failing to comply with specific discovery orders. In short, Debtor's conduct amounts to an affront to this particular Court and to the entire judicial process.

Judge Malott ordered that the sanction be deducted from distributions otherwise payable to Debtor from the MPK Trusts.

Over four days in April 2017, Judge Malott tried the Abruzzos' counterclaims. He issued extensive findings and conclusions on July 7, 2017, including:

> A trial on the merits was held on June 29, 30, July 1, 2, and 6, 2015.
>
> After testifying directly at trial, Mr. Kearney failed to appear for cross-examination and proffered a medical excuse which has never been substantiated in any manner.
>
> After the close of Mr. Kearney's case, the Court granted Defendants' motion for a judgment as a matter of law on [all claims].
>
> The court granted the Defendants attorney's fees in the amount of $510,000 plus Gross Receipts Tax.

-4-

The court also awarded $120,215.69 in costs.

Mr. Kearney admitted that it is a violation of the Trusts' spendthrift clause to promise people payment from the Trusts.

Mr. Kearney's repeated violations of the Confidentiality Orders and attendant disclosure of both ARCO's discrete financial information as well as information about the Trust assets and operation are a breach of trust.

The record is replete with Kearney's repeated breaches of his duty as a trustee through self-dealing with third parties, improper disclosures of financial information, and attendant violations of the orders of this court, as well as the clear indication that future litigation will ensure [sic], notwithstanding his resignation as a trustee.

The court has already found that Mr. Kearney has significant credibility issues. Nothing at trial assuaged those issues.

Clear and convincing evidence exists that Mr. Kearney is unable to successfully manage his financial life on the trust distributions he receives, and is significantly in debt.

Mr. Kearney did not participate in a December 2016 mediation in good faith and should pay the full costs of the mediation.

The parties have reached a level of discord, distrust, and distaste such that it would be difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to serve appropriately as Trustees, compensated or uncompensated, into the foreseeable future.

Kearney's conduct has resulted in a toxic relationship between the parties which adversely impacts the operation of the Trust and makes it difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to effectively serve as Trustee.

Clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the facts and circumstances shown by the evidence of this case, and that modification of the Trust is appropriate under 46A-4- 412 NMSA.

Good cause, upon clear and convincing evidence, exists for modification of the Mary Pat Abruzzo Kearney Trust, including but not limited to appointment of a Successor Trustee and establishment of directives for further administration of the Trust and its assets in a manner which will effectively protect all beneficiaries equally.

*The Bankruptcy Case*

Debtor filed this bankruptcy case on September 1, 2017, on the eve of a hearing in the State Court Action on a potential successor trustee for the MPK Trusts.

The United States Trustee's office appointed an unsecured creditors' committee ("UCC") on November 22, 2017. On December 21, 2017, the Court granted Debtor's motion to extend the

"exclusivity" period of § 1121(c)(3) until June 12, 2018. Debtor and the UCC attempted over the next several months to agree on the terms of a plan.

On April 2, 2018, Debtor filed a plan of reorganization and a motion to further extend his exclusivity period. The UCC, unsuccessful in negotiations with the Debtor, objected. The Court denied the motion.[8]

The UCC filed a competing plan of reorganization on July 12, 2018.[9] The UCC Plan was premised on certain changes to the MPK Trusts, namely:

> 1. That ARCO pay the sum of $12,571,799 to the MPK Trusts in exchange for all ARCO shares held by the trusts;
> 2. That the Trustees pay $3,000,000 to Debtor, who then delivers it to the Creditor Trustee (as defined in the UCC Plan); and
> 3. The Allowed Priority Tax Claim of the IRS of $350,890.55 be paid over a period of five years from the Petition Date-on or before September 1, 2022-in February and August of each year, from the net income that would otherwise be distributable to Mr. Kearney from the MPK Trusts.

(the "Trust Modifications"). The Trust Modifications required approval of the State Court. The UCC Plan settled all Debtor and estate claims against ARCO, the Abruzzos, and others in exchange for the $3,000,000.[10]

The Debtor reacted to the UCC Plan with outrage and threats. Debtor argued that the UCC, the Abruzzos, ARCO, and others were engaged in an illegal scheme to violate state trust law and deprive him of his rights under the MPK Trusts. He accused many people of breaching their fiduciary duties to him by pursuing the UCC Plan. He sued the Abruzzos for breach of duty.

---

[8] Debtor appealed the denial, the first of three appeals Debtor has filed in this case, in addition to appealing Judge Malott's rulings in the State Court Action, and the threatened appeal of this confirmation opinion and order.

[9] The Debtor also continued to file amended plans, the last of which, his seventh amended plan, was filed January 22, 2019.

[10] In contrast, the cornerstone of all Debtor's plans is pursuit of litigation against ARCO, the Abruzzos, and others.

Case 17-12274-t11    Doc 845    Filed 02/28/19    Entered 02/28/19 16:00:01 Page 6 of 23

Debtor's response showed his mistaken belief that only he should be allowed to control the reorganization process, whatever the cost, delay, or acceptability of payment proposals.

On August 30, 2018, the Abruzzos filed a motion for relief from stay, seeking permission to ask Judge Malott for a hearing on the Trust Modifications. The Court granted the motion. Judge Malott provided an October 3, 2018, hearing date.[11] The Abruzzos then filed a supplemental stay relief motion so the hearing could proceed. The Court granted the stay motion on September 18, 2018, over Debtor's objection.

*State Court Review of the Trust Modifications*

On October 2, 2018, the Debtor removed the State Court Action to the United States District Court for the District of New Mexico, alleging diversity of citizenship. The action was assigned to Judge Judith C. Herrera. She promptly transferred the action to this Court, holding:

> Kearney's diversity allegations are frivolous. The notice of removal claims, for the first time, that Kearney is a Nevada citizen. However, he filed the original lawsuit against the Abruzzos in New Mexico's Second Judicial District Court in 2013 and the New Mexico bankruptcy case in 2017.... Kearney's attempt to remove the actions directly to this Federal District Court appears to be a sham litigation tactic to avoid a ruling by the Bankruptcy Court.[12]

The Court granted the Abruzzos' motion to abstain and remand on October 11, 2018. Judge Malott rescheduled the hearing on the Trust Modifications for October 23, 2018, and the hearing took place on that date. By an order entered October 31, 2018, Judge Malott approved the Trust Modifications, finding, inter alia:

> The evidence which has developed in this matter since June 2015 is clear and convincing that Mr. Kearney initiated this litigation with the purpose of damaging the Abruzzos individually and to foster his apparent plan to force a hostile takeover of the Abruzzo interests and the assets of ARCO by gaining access to financial and

---

[11] The original hearing date was September 27, 2018, but was moved at Debtor's request.

[12] Michelle Daskalos, Debtor's ex-wife, filed for divorce in 2015. In their November 18, 2015, marital settlement agreement, Debtor stated under oath that he had been a New Mexico resident more than six months before the petition was filed.

in-house information and documentation through discovery which he could not have accessed otherwise, and then disseminating such information to third parties in repeated violation of the Court's Orders and admonishments and in spite of significant monetary sanctions. . . .

Article XVI [of Mary Pat Kearney's will] . . . provides the Trustee may engage in the sale or disposition of Trust assets "irrespective of the occupancy by the same person of dual positions, to deal with itself in its separate, or any fiduciary, capacity."

. . . In this case, the terms of the MPK Testamentary Trust specifically waive the Trustees' conflicts of interest which may exist regarding "buying and selling assets" of the Trust. Article XVI (16).

Further, the Court approves the transactions contemplated by "The Three Issues," as more specifically detailed herein, because those actions, and each of them, are fair, reasonable, and proper under the totality of the circumstances and are ultimately in the best interests of all the beneficiaries.

It takes no speculation to conclude that Mr. Kearney's litigious approach has an adverse effect on the Trust, the operations of ARCO - the stock of which is the Trust corpus - and the fair market value of ARCO stock. After all, who wouldn't [sic] want to buy stock in a small corporation facing protracted litigation - described by Bankruptcy Court Judge Thuma as rife with "difficulties and red flags" as to both the claims and Kearney's motivations in bringing them - with attendant expense and diversion of the corporation's energy and assets?

The Trustees are fulfilling their fiduciary duty in attempting to support the UCC Plan which provides a solution to Mr. Kearney's financial problems rather than exacerbating those problems as the Kearney Plan does.

ARCO shareholders have willingly sold, at arm's length, their shares to ARCO since ARCO's creation thirteen years ago. Sales by shareholders of ARCO's predecessors at arm's length date back many years before that. Presently, ARCO has bought from willing sellers their minority interests at $79,000.00 per share. $79,000.00 per share is the same price that the UCC Plan proposes that ARCO purchase the ARCO shares from the Trusts.

Mr. Kearney and others (using confidential information) proposed purchasing a controlling interest of ARCO shares for $110,000.00 per share. A 35% discount ($110,000.00 - $38,500.00 = $71,500.00) is a reasonable discount for these minority shares because the ARCO shares held by the Trusts are a minority interest and restricted by the MPAK Trust and ARCO by-laws.

At the hearing on October 23, 2018, Mr. Kearney proffered without objection two (2) exhibits which he characterized as "Offers" to purchase ARCO's stock from the Trust. These were not offers, but were indications of interest at most. However, they are illustrative of the fair market value of the ARCO stock at issue.

The September 24, 2018, letter of interest from MHR Fund Management LLC purports to offer $17,500,000.00 for the Trust's ARCO stock. However, in addition to numerous reservations and contingencies which might affect the ultimate price or the efficacy of the deal entirely, that letter goes on to demand "Stalking Horse" status for MHR which would impose fees, expenses, and related payments that would ultimately lower the net price of the stock significantly.

The September 24, 2018, letter of interest from Mexcap similarly contains significant contingencies and reservations which might prevent the deal from ever occurring and also demands "Stalking Horse" status for Mexcap. While MHR's letter does not specify its fees, etc., Mexcap specifically requires, inter alia, $500.00 per hour professional and administrative fees, a "breakup fee" of $150,000.00, a "topping fee" of one-third of the difference between the ARCO offer of $12,571,799.00 and the amount Mexcap actually ultimately pays for the stock.

Assuming Mexcap's figure of $16,500,000 for the ARCO stock, those fees and expenses would significantly reduce the ultimate share price; the "breakout" and "topping fees" alone would account for some $1,500,000.00.

Given the contingencies, delays, and "stalking horse" fees, the price per share which might speculatively come from further arrangements with MHR or Mexcap is not substantially greater than the non-contingent, unencumbered and prompt purchase price offered by ARCO.

There have been no other expressions of interest.

There have been no actual offers to purchase except the pending offer from ARCO. The proposed amount of $12,571,799.00 at $79,000.00 per share owned by the Trusts is the fair market value of the ARCO stock owned by the Trusts.

The ARCO re-purchase offer of $12,571,799.00 is fair and reasonable under the totality of the circumstances giving consideration to the minority nature of the stock interest, the restriction on sale due to ARCO's right of first refusal, and the negative effect on the attractiveness of investing in ARCO caused by Mr. Kearney's continuing litigation, and plans for further litigation.

Clear and convincing evidence exists that the settlor Mary Pat Abruzzo Kearney did not anticipate the level of discord, distrust, acrimony, damages, and potential damage that exists related to Mr. Kearney's distributions from the Trusts based upon the ARCO dividends paid to the Trusts.

Clear and convincing evidence exists that the continued retention by the Trusts of the ARCO stock will lead to further strife which is directly contrary to the anticipation of and desires of the settlor Mary Pat Abruzzo Kearney.

Because clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the retention of the ARCO stock in the Trusts would cause the foregoing, modification of the Trusts is appropriate under §46A-4-412.

The payment by the Trustees of $3,000,000.00 from principal to Mr. Kearney, with him then being required to deliver it to the Creditor Trustee as proposed, is a proper action by the Trustees and is in accordance with their fiduciary duties to Mr. Kearney and to all beneficiaries.

The Trusts should be modified to allow, on a one-time basis, the payment by the Trustees of the $3,000,000.00 from principal to Mr. Kearney as provided in the Trust Modifications.

The transactions contemplated by "The Three Issues" are actions within the scope of the Trustees' powers and responsibilities as authorized by The MPK Testamentary Trust.

The transactions contemplated by "The Three Issues" are approved by the Court as appropriate and proper under the totality of the circumstances and are in the best interests of all the beneficiaries, including the remaindermen.

The transactions contemplated by "The Three Issues" are not voidable transactions under Section 46A-8-802.

The MPK Testamentary Trusts should be modified, and hereby are so modified, to allow the Trustees to make a one-time $3,000,000.00 distribution from principal to Mr. Kearney, but only upon approval of the pending UCC Plan by the Bankruptcy Court.

*The Confirmation Hearing*

On November 13, 2018, the Court approved disclosure statements for the UCC Plan and the Debtor's sixth amended plan and set final confirmation hearings for both on January 31, 2019.

Plan voting ended on December 18, 2018. Unsecured creditors voted against Debtor's plan and in favor of the UCC Plan.[13]

Because general unsecured creditors voted against Debtor's plan, it appeared to violate the "absolute priority rule" of § 1129(b)(2)(B)(ii). *See In re Stephens*, 704 F.3d 1279, 1286-87 (10th Cir. 2013). The Court had asked Debtor's counsel about this potential problem for months. On January 22, 2019, Debtor filed a seventh amended plan which proposed, for the first time, to transfer all of Debtor's assets to a "plan administrator" and pay interest on unsecured claims. On January 23, 2019, the Court ruled that plan could not be considered for confirmation on January 31, 2019, because the changes were too significant.[14]

The Court held a confirmation hearing on the UCC Plan on January 31 and February 1, 2019. Objections were filed by the Debtor, Ms. Daskalos, Wells Fargo, the IRS, New Mexico Taxation and Revenue Department ("NMTRD"), and U.S. Bank. By a stipulation reached just

---

[13] Debtor plan: 71% of votes were against; 96% of dollars voted were against; UCC Plan: 84% of votes were in favor; 97% of dollars voted were in favor.

[14] Debtor's latest plan has serious problems. The main funding sources are litigation recovery and payments from the MPK Trusts. If the litigation has little or no net value, which to the Court appears likely, then it would take decades to repay unsecured creditors, if they were ever paid at all. Further, there would be no way for creditors to collect what they are owed because of the spendthrift provision of the trusts. Finally, the restrictions on Debtor's spending was loose and vague, leading to the possibility that he would not have to pay much to his creditors from trust distributions.

before the confirmation hearing but not filed until February 21, 2019 (the "Amendment Stipulation"), all objections except those of the Debtor and Ms. Daskalos were resolved.

Louis Abruzzo, ARCO's president, testified that ARCO would borrow $8.6 million and use $4.0 million of its own cash to buy the MPK Trusts' ARCO stock. Evidence showed that ARCO has excellent prospects of borrowing the money. Peter Generis, Vice President of CBRE Capital Markets, testified that ARCO would almost certainly qualify for the proposed loan and could easily borrow up to $9.85 million if it wanted to.[15]

The Abruzzos and ARCO are motivated to complete the Trust Modifications so their ties with Debtor are severed. They view the Trust Modifications as the only way to prevent Debtor from continuing to sue them *ad infinitum*. The Court finds that this view is reasonable. The Court further finds that once its confirmation order become final and non-appealable, ARCO and the Abruzzos will complete the Trust Modifications transactions diligently.

UCC members testified that they formulated the UCC Plan to try to pay unsecured creditors as much as possible. They testified that they did not view the Debtor's plan as providing any realistic prospect of payment. The Court finds the testimony of the UCC members credible. One testifying member, Betty White, was or is a friend of the Debtor. The other testifying member, Nick Tarlson, was Debtor's expert witness in the State Court Action. The UCC Plan was not motivated by hostility toward the Debtor, but because it was the best deal they could get.

Ms. White and Mr. Tarlson testified that shortly before the confirmation hearing they received phone calls from someone interested in buying their claims. The purpose was to take control of the UCC and force the withdrawal of the UCC Plan. The Court finds that Debtor's bankruptcy counsel was not aware of this skullduggery and strongly advised against it when it was

---

[15] ARCO applied for the loan before the confirmation hearing.

disclosed. The Court also finds, however, that Debtor must have been aware of the plan, and likely spearheaded it, adding to an already long list of questionable or improper actions he has taken in the State Court Action and this bankruptcy case.[16]

*Administrative Expenses*

Throughout the case, Debtor has declined to pay professional fees. Besides an original $15,000 retainer, UCC counsel was not paid until the Court ordered Debtor to make a payment. The same misfortune befell Debtor's counsel. UCC counsel filed a Motion to Compel Payment on November 14, 2018. On December 6, 2018, the Court ordered Debtor to pay UCC counsel and Debtor's counsel $5,000 within seven days.

Debtor refused, stating that he did not have enough money to do so. Evidence presented at a final hearing on the motion to compel payment showed that after the UCC motion was filed, Debtor transferred a $60,306.00 to his ex-wife, paid $31,692.24 on his mortgage, and paid $61,513.64 to the IRS. Between November 14 and December 7, 2018, Debtor's bank account went from $173,000 to $16,700.

Professional fee applications filed in December 2018 indicate the following:

| | |
|---|---|
| NM Financial Law: | $ 16,663.09; |
| Foley Gardere: | $1,087,082.00; |
| Domenici Law: | $ 57,922.00; |
| Myrle Schwalm: | $ 5,000.00; |
| Lain Faulkner: | $ 197,385.83; |

---

[16] These actions include: 1. Claiming that Mary Pat Abruzzo was a Nevada resident when she died; 2. Divulging confidential information obtained in the State Court Action to third parties, in violation of court orders; 3. Mediating in bad faith; 4. Failing and refusing to pay professional fees incurred in this case; 5. Failing to alter his expensive lifestyle or spending habits while a bankruptcy debtor; 6. Failing to appear and testify under oath in this case; 7. Changing his position about his state of residence in the State Court Action, his divorce case, this case, and the lawsuit he brought in Nevada; 8. Responding to the Court's order to pay professional fees by emptying his bank account; 9. Paying his home mortgage in violation of the automatic stay; 10. Changing his position about the value of his intellectual property; 11. Removing the State Court Action on the eve of trial; and 12. Filing a lawsuit in Nevada against the Abruzzos, ARCO, and others alleging breach of duty, on the eve of a hearing in state court that would determine that issue.

-12-

| | |
|---|---|
| Reid Collins & Tsai: | $ 4,222.32; |
| Walker & Associates: | $ 271,444.08; |
| Total fees charged to the estate: | $ 1,639,719.32 |

## II.    DISCUSSION

A.    §1129(a)(1). The Court finds and concludes that the UCC Plan complies with the applicable provisions of the Code. The objections discussed below are overruled.

1.    Settlement of estate claims against the Abruzzos, ARCO, etc. Debtor argues that the proposed settlement of all of Debtor's and the estate's claims against ARCO, the Abruzzos, and others is not fair and equitable and is not supported by adequate consideration.

Fed. R. Bankr. P. 9019 provides that, after a hearing on notice to creditors, the court may approve a compromise or settlement. Generally, the court must determine whether the settlement is fair and equitable and in the best interests of the estate. *Woodson v. Fireman's Fund Ins. Co. (In re Woodson)*, 839 F.2d 610, 620 (9th Cir.1988); *LaSalle Nat'l Bank v. Holland (In re American Reserve Corp.)*, 841 F.2d 159, 161 (7th Cir. 1987). "To make this determination, the court should consider the probable success of the litigation on the merits, any potential difficulty in collection of a judgment, the complexity and expense of the litigation and the interests of creditors in deference to their reasonable views." *In re Kaiser Steel Corp.*, 105 B.R. 971, 976–77 (D. Colo. 1989), citing *In re The Hermitage Inn, Inc.*, 66 B.R. 71, 72 (Bankr. D. Colo. 1986). In so doing, the Court need not decide the numerous issues of law and fact raised by a compromise or settlement, "but must only 'canvass the issues and see whether the settlement falls below the lowest point in the range of reasonableness.'" *In re Dewey & LeBoeuf LLP*, 478 B.R. 627, 640–41 (Bankr. S.D.N.Y. 2012); *In re Adelphia Comm. Corp.*, 327 B.R. 143, 159 (Bankr. S.D.N.Y. 2005) (quoting *In re W.T. Grant Co.*, 699 F.2d 599, 608 (2d Cir. 1983)). The Court need not "conduct a 'mini-trial'" but rather "only need be apprised of those facts that are necessary to enable it to evaluate

the settlement and to make a considered and independent judgment." *In re Dewey*, 478 B.R. at 640-41; *Adelphia*, 327 B.R. at 159.

In *In re Kopexa Realty Venture Co.*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997), the Tenth Circuit Bankruptcy Appellate Panel adopted the following four-factor test for evaluating the proposed settlements: (1) the chance of success on the litigation on the merits; (2) possible problems in collecting the judgment; (3) the expense and complexity of the litigation; and (4) the interest of the creditors in deference to their reasonable views. *See In re Southern Medical Arts Cos., Inc.*, 343 B.R. 250, 256 (10th Cir. BAP 2006) (citing *Kopexa*). The Court evaluates the *Kopexa* factors as follows:

| | |
|---|---|
| 1. The chance of success of the litigation on the merits. | Favors the settlement. The Court finds the Debtor has little chance of obtaining any substantial net recovery through continued litigation. To date, his claims against the Abruzzos and ARCO have cost him nearly two million dollars in attorney fees, costs, and sanctions. He is not a sympathetic plaintiff. The evidence presented in his first trial supports Judge Malott's finding that neither ARCO nor the Abruzzos breached any duties to him, the MPK Trusts, or any other party. Debtor's first, best chance for a litigation recovery was in his first lawsuit; he lost badly. |
| 2. Possible problems in collecting the judgment. | Does not favor the settlement. ARCO and the Abruzzos appear to be highly solvent and able to respond to an adverse judgment. |
| 3. The expense and complexity of the litigation. | Favors the settlement. The litigation Debtor wishes to bring against the Abruzzos, ARCO, and others would be expensive, even though Debtor's new law firm would take the case on a contingent fee. In the State Court Action, Debtor had to pay his counsel (which he has yet to do), the Abruzzos' counsel, costs, and a $100,000 sanction. |
| 4. The interest of the creditors. | Favors the settlement. The general unsecured creditors do not support further litigation. They voted overwhelmingly against Debtor's litigation plan, and overwhelming for the UCC settlement plan. If the Court were to allow Debtor to proceed with his wished-for litigation, it would be going against the considered choice of the creditor body.[17] |

---

[17] It is significant that several large creditors who support the UCC Plan and voted against the Debtor's plan were intimately involved in the State Court Action. Kevin Yearout, Debtor's biggest creditor, helped fund the litigation and paid some attorney fees. Creditor Nick Tarlson, a member of the UCC, was one of Debtor's expert witnesses. Both men are sophisticated and knowledgeable.

Overall, the *Kopexa* factors weigh heavily in favor of the settlement.

The Court finds that the proposed settlement is supported by adequate consideration. The litigation to be settled is of questionable value. It may be worth nothing or less than nothing. In exchange for the releases, ARCO is borrowing money, redeeming $12.6 million of its stock, and releasing its claim against the Debtor. The Abruzzos, including Nancy Abruzzo, are releasing their claims against the Debtor; lastly, remainder beneficiaries to the MPK Trusts are giving up $3,000,000 plus their pro rata share of taxes.

The Court finds that the proposed settlement is fair and equitable to the Debtor, his estate, and his creditors, and is supported by adequate consideration.

2.  Treatment of Ms. Daskalos' Claim Complies With the Code's Priority Scheme. Debtor is obligated to pay his ex-wife Michelle Daskalos $16,000 a month in alimony and child support. The UCC Plan proposes to pay any pre-petition claim in full on the Effective Date.[18] Any post-petition amounts due would be a nondischargeable obligation of Debtor.

Ms. Daskalos argues that the UCC Plan will not leave Debtor with enough income to pay her domestic support obligation. The Court overrules the objection. With the Trust Modifications, the MPK Trusts will have about $8,000,000 to invest. Assuming a 5% annual return, the trusts would be able to pay Debtor about $400,000 a year. The domestic support obligation to Ms. Daskalos is $192,000 per year. Priority tax claims total $436,000, or $109,000 per year for four years. The Debtor's domestic support obligation payments are tax deductible, so Debtor's annual taxable income would be about $208,000. At a 40% tax rate, Debtor's trust fund income would be enough to pay Ms. Daskalos and the taxing authorities, with about $16,000 left over. After four

---

They understand the nature and implications of Debtor's resounding defeat in the State Court Action and believe that more litigation is not in their best economic interests.
[18] Ms. Daskalos did not file a proof of claim.

years, that amount will increase to about $125,000 per year. In the meantime, Debtor may have to ask the divorce court to reduce his support obligation, or he may have to get a job, or both. In any event, there will be enough money to pay Ms. Daskalos.

Ms. Daskalos fails to appreciate that Debtor's current financial situation is very poor. Debtor owes about $8,600,000 in pre-petition debt and $1,600,000 in post-petition debt. If the case were dismissed, creditors would soon get judgments and start garnishing Debtor's bank accounts. Debtor squandered his fortune and owes more than he can repay. The UCC Plan benefits Ms. Daskalos because it discharges his debt, substantially increasing his ability to pay alimony and child support. Confirmation of the UCC Plan will benefit Ms. Daskalos, not harm her.

B.      §1129(a)(2).

The Court finds and concludes that the proponent of the plan has complied with the applicable provisions of Title 11.

C.      §1129(a)(3).

The Court finds and concludes that the UCC Plan has been proposed in good faith and not by any means forbidden by law. The objections discussed below are overruled.

1.      The Plan Does Not Violate New Mexico Spendthrift Trust Law. Debtor argues that the Court cannot confirm a plan of reorganization that uses assets from a spendthrift trust in violation of state law and the Code. The argument misses the mark. The UCC Plan does not improperly reach assets protected by a spendthrift trust because the MPK Trusts were modified by Judge Malott. His approval of the Trust Modifications means that the proposed plan distributions do not violate state law, the spendthrift trust provisions, or the Code.

2.      Good Faith; No Means Forbidden by Law. Debtor argues that the UCC Plan was not proposed in good faith and contains provisions forbidden by law. This argument has no merit.

A strong argument can be made, and the Court believes, that the UCC Plan is in the Debtor's best interest. He will get a bankruptcy discharge. $3,000,000 will pay his debts of more than $8,600,000. He will no longer be able to waste time and money pursuing questionable litigation against his in-laws. He may be forced for a time into gainful employment, which might not be a bad thing. It is time for him to move on. While Debtor cannot see that, it is obvious to most others. After four years or so of reasonable belt-tightening, Debtor can live post-bankruptcy with a fresh start and the prospect of a healthy lifetime income most people would consider a godsend. The Plan was proposed and developed in good faith.

       3.      <u>The Abruzzos Did Not Breach Their Duties by Proposing the Trust Modifications</u>.

Debtor also argue that the Abruzzos breached their fiduciary duties by promoting the UCC Plan. Judge Malott considered and overruled the argument. In his October 31, 2018, ruling he found:

> The Trustees are fulfilling their fiduciary duty in attempting to support the UCC Plan which provides a solution to Mr. Kearney's financial problems rather than exacerbating those problems as the Kearney Plan does.

The Court agrees with Judge Malott that the Abruzzos did not breach their duties to the Debtor by proposing and obtaining approval of the Trust Modifications.

D.      <u>§1129(a)(4)-(8)</u>.

      The Court finds and concludes that the UCC Plan complies with this §§ 1129)(a)(4), (5), (7), and (8). The Court finds and concludes that § 1129(a)(6) does not apply. No party argued that the UCC Plan violated any of these subsections.

E.      <u>§1129(a)(9)</u>.

      The Court finds and concludes that the UCC Plan complies with § 1129(a)(9), which deals with the payment of priority claims. The objections discussed below are overruled.

1.      <u>IRS Priority Tax Claim</u>. Debtor argues that the Plan violates § 1129(a)(9) because it pays the IRS priority tax claim over five years while general unsecured claims get paid on the Effective Date. The argument fails because, inter alia, the IRS has agreed to its treatment. Section 1129(a)(9) provides: "Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim . . . ." The Amending Stipulation resolved this objection.

2.      <u>Wells Fargo</u>. Wells Fargo objected to its treatment as the Class 3 creditor. The Amending Stipulation also resolves this objection, as well as the objection filed by U.S. Bank.

F.      <u>§1129(a)(10)</u>.

The UCC Plan complies with this Code section. Class 6 (general unsecured claims) is impaired and voted to accept the UCC Plan.

G.      <u>§1129(a)(11)</u>.

The Court finds and concludes that the UCC Plan complies with § 1129(a)(11). The Debtor's feasibility objections, discussed below, are overruled.

Section 1129(a)(11) requires that confirmation of a plan not be "likely to be followed by liquidation, or the need for further financial reorganization, of the debtor." 11 U.S.C. § 1129(a)(11); *In re Multiut Corp*., 449 B.R. 323, 347 (Bankr. N.D. Ill. 2013). While the plan proponent need not demonstrate that a plan carries a guarantee of success, the plan proponent must offer concrete evidence of the plan's feasibility. *Id*. "The purpose of section 1129(a)(11) is to prevent confirmation of visionary schemes which promises creditors and equity security holders more under a proposed plan than the debtor can possibly attain after confirmation." *In re Pikes Peak Water Co*., 779 F.2d 1456, 1460 (10th Cir. 1985). *See also In re D & G Investments of West Florida, Inc.*, 342 B.R. 882, 886 (Bankr. M.D. Fla. 2006); *In re Brandywine Townhouses, Inc.*, 524 B.R. 889, 892 (Bankr. N.D. Ga. 2014).

1. <u>Likelihood of Judge Malott Being Reversed</u>. The Debtor argues that the UCC Plan is a visionary scheme because Judge Malott's approval of the Trust Modifications will be reversed on appeal. The Court will evaluate the possibility of a reversal. *See, e.g., In re Harbin*, 486 F.3d 510, 518-20 n.7 (9th Cir. 2007) (the bankruptcy court has an obligation under §1129(a)(11) to consider the likelihood of a pending appeal and the impact of a successful appeal on the plan of reorganization).

The Court finds and concludes that Judge Malott's ruling likely will be affirmed on appeal. His October 31, 2018, ruling was a continuation of, and in some ways a culmination of, years of litigation in the State Court Action. To consider the proposed Trust Modifications, Judge Malott took new evidence and reviewed evidence from earlier trials and hearings.

Debtor argues that "there is no law supporting the state court's findings and conclusion allowing the Trustees to modify the Trusts without the Debtor's consent…" That is not true. Judge Malott's decision rests on clear statutory authority, on a reasonable interpretation of Ms. Kearney's will, and upon well-grounded findings of fact.

Judge Malott held, and this Court agrees, that the "powers and discretion granted the Trustees could not be more broad than as stated in Mrs. Kearney's Will." The will provides the Trustee "absolute discretion" to manage the Trust assets including the power "to sell or dispose of... any property, real or personal, constituting a part of ... the Trust estate... upon such terms and conditions as it may deem best."

A trustee's discretion is tempered by New Mexico's Uniform Trust Code,[19] which allows beneficiaries to avoid transactions involving conflicts of interest unless "the conflict is authorized by the terms of the trust." N.M.S.A. § 46A-8-802(B) and (C). Here, Ms. Kearney's will waived

---

[19] N.M.S.A. § 46A-1-101 et seq.

the Abruzzos' conflicts of interest regarding "buying and selling assets" of the Trust. The Court therefore agrees with Judge Malott that the MPK Trusts' sale of stock to ARCO is not a voidable conflict of interest. Approval of the transaction over a conflict of interest objection is likely to be affirmed on appeal.

Judge Malott's determination that the proposed sale price of ARCO stock for $79,000 per share is also likely to be affirmed. Malott noted evidence of a recent sale of ARCO stock from willing sellers for the exact same price. Further, the two "offers" proffered by the Debtor came with significant conditions that not only reduced the actual final value of the offers but made the offers non-binding. Given that ARCO's offer was the only binding one, combined with recent history of arms-length sales for the same price, the Court finds that Judge Malott's ruling that the price is fair is likely to be upheld on appeal.

Judge Malott's one-time modification of the MPK Trusts under N.M.S.A. § 46A-4-412 also is likely to be affirmed. § 46A-4-412 provides:

> A. The court may modify the administrative or dispositive terms of a trust or terminate the trust if it is established by clear and convincing evidence that there are circumstances not anticipated by the settlor and modification or termination will further the purposes of the trust. To the extent practicable, the modification must be made in accordance with the settlor's probable intention.
> B. The court may modify the administrative terms of a trust if continuation of the trust on its existing terms would be impracticable or wasteful or impair the trust's administration.

There is support in the record for Judge Malott's finding that Ms. Kearney's foremost goal was preserving a good relationship with her brothers. There also is abundant evidence that Ms. Kearney could not have anticipated her husband's obsession with suing her brothers, nor that the trusts she created for his well-being would become his instruments to bludgeon them and the family business with endless, fruitless litigation.

The Trust Modifications will prevent further fighting while continuing the goal of providing economic protection for the Debtor that the spendthrift provision provides. The Court holds that Judge Malott's modification of the MPK Trusts is likely to be upheld on appeal.[20]

Debtor also argues that Judge Malott committed reversible error by hearing the proposed Trust Modifications in the State Court Action rather than a new proceeding. The Court disagrees with this argument. When the Abruzzos filed their counterclaim in the State Court Action on August 14, 2015, they sought significant modifications to the MPK Trusts. In their second amended counterclaim, filed November 30, 2016, the Abruzzos asked for the following relief:

> Defendant Co-Trustees request the modification or the termination for the existing Trusts and distribution of the assets based on Mr. Kearney's life expectancy and the appropriate Internal Revenue Service calculations. This Court should enter an order terminating or modifying the Trusts and creating a new trust for Mr. Kearney's interests with appropriate spendthrift, bankruptcy, and other restrictions on all amounts received by Mr. Kearney.

Judge Malott's July 7, 2017 Findings of Fact and Conclusions of Law, Conclusion #12, states: "Trust Modifications shall be determined in a separate proceeding scheduled for September 5, 2017." The hearing was stayed by Debtor's bankruptcy petition. Modification of the MPK Trusts has been a live issue in the State Court Action for years.

Further, there is no prejudice to the Debtor having the matter heard in the State Court Action rather than a new action. The judge was intimately familiar with the facts, had presided over eight or nine days of trial and many hearings, and had taken a great deal of evidence. Hearing the proposed Trust Modifications in the State Court Action made every kind of sense.

---

[20] Judge Malott's decision is also consistent with § 46A-4-412(B). The level of acrimony, litigation, and expense generated by the MPK Trusts' ownership of ARCO stock, combined with Debtor's ceaseless desire for more litigation, would justify a modification. The status quo renders the Trusts impracticable and wasteful, and impair trust administration.

2.    <u>Closing the Trust Modification Transactions</u>. Debtor argues that the UCC Plan is not feasible because ARCO plans to borrow $8,500,000 to finance the stock redemption from the MPK Trusts, and there is no guarantee the financing will materialize. The Court overrules this argument. The uncontroverted testimony is that ARCO has $4,000,000 in cash on hand, can easily borrow $8,500,000 to close the proposed transactions. ARCO will not close the transaction until a confirmation order becomes final and non-appealable. That likely will cause delay. However, the Court understands ARCO's and the Abruzzos' wish for finality before closing the Trust Modifications, given the history of this case and the State Court Action. In addition, waiting until all appeals have been exhausted means that there will be no risk of equitable mootness, about which the Debtor apparently is concerned.[21]

3.    <u>Disclosure of ARCO's Intent to Borrow Money to Fund the Stock Purchase</u>. Debtor argues that the UCC should have disclosed that ARCO intended to borrow $8.6 Million to fund the stock redemption, and that the failure to do so taints the confirmation process. The Court overrules this argument. The evidence is that ARCO is a very sound business with substantial ability to borrow more than $8.6 million if necessary. Louis Abruzzo testified that ARCO could pay the entire purchase price in cash if necessary. Nick Tarlson testified that ARCO's creditworthiness stands in stark contrast to the Debtor's. All things considered, the Court does not find that ARCO's decision to borrow part of the purchase price rather than pay cash is material and needed to be disclosed.

H.    <u>§ 1129(a)(12)-(16)</u>.

---

[21] See Judge Fouratt's Order Denying Emergency Motion for Stay Pending Appeal, entered October 19, 2018 in 1:18-cv-00888-JB-GJF.

The Court finds and concludes that the UCC Plan complies with this §§ 1129(a)(12), (14), (15), and (16). The Court finds and concludes that § 1129(a)(13) does not apply. No party argued that the UCC Plan violated any of these subsections.

III.    <u>CONCLUSION</u>

The UCC Plan complies with § 1129. The Debtor's and Ms. Daskalos' objections to the UCC plan lack merit and are overruled. The Court will enter a separate confirmation order.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: February 28, 2019

Copies to: counsel of record