UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

VICTOR P. KEARNEY,                                              Case no. 17-12274-t11

    Debtor.

## **OPINION**

Before the Court is the final fee application of Reid Collins & Tsai LLP ("RCT"), seeking payment of a 25% contingent fee on a $3,000,000 trust distribution to the bankruptcy estate. The Unsecured Creditors' Committee ("UCC") and the United States' Trustee's office objected to the fee application. The parties have asked the Court to rule on all legal issues. The Court has reviewed the relevant documents filed in the case and reaches the legal conclusions set out below.

                                                   I.         Facts

The Court finds the following facts:[1]

Benjamin and Pat Abruzzo developed the Sandia Peak Ski Area and the Sandia Peak Tramway, both owned by their company Alvarado Realty Company ("ARCO"). The Abruzzos died in a plane crash in 1985, survived by their children Louis, Benjamin, Richard, and Mary Pat. The children took over management of ARCO after their parents' death.

Mary Pat Abruzzo married the Debtor in 1988, when she was 22. She executed a last will and testament on July 8, 1988.

Mary Pat Kearney died when she was 31. At the time she owned about 18.5% of ARCO's

---

[1] The Court took judicial notice of the docket in the main case and all adversary proceedings. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same).

stock. Under her will, the stock was bequeathed to two testamentary trusts (together, the "MPK Trusts") for the benefit of the Debtor during his lifetime. Upon Debtor's death, the corpus of the trusts is to be distributed to Louis, Benjamin, and Richard Abruzzo or their children. Ms. Kearney's will appointed Debtor and Louis and Benjamin Abruzzo (the "Abruzzos") as co-trustees of the MPK Trusts.

Relations between the Debtor and the Abruzzos soured over time, in spite of substantial distributions from the MPK Trusts (about $800,000 per year). In 2013, Debtor sued the Abruzzos in New Mexico state court, cause no. D-202-CV-2013-07676 (the "State Court Action"), alleging that they had breached their fiduciary duties to Debtor in a number of ways, all of which resulted in reduced trust account distributions to him. The Abruzzos filed a counterclaim for breach of fiduciary duty, to modify the trusts, and for other relief. The action was assigned to the Hon. Alan Malott.

Judge Malott presided over a five-day jury trial of Debtor's claims against the Abruzzos in June and July 2015. On July 6, 2015, Judge Malott directed a verdict against Debtor on all his claims. Judge Malott made the following findings of fact in open court:

> There has been no substantial evidence that the Abruzzos in fact control ARCO. . . . . I see no evidence of actual control.
> I don't find that the Abruzzos misused any control they may have had in this circumstance. The totality on which the entire Plaintiff's case rests is if it's good for ARCO, it must be bad for Victor Kearney. That's not the law; that's not the evidence in this case.
> . . . . [T]he Abruzzos' efforts on behalf of ARCO . . . have been . . . extremely successful. . . . The fact that the Abruzzos have run their company properly does not translate into a starvation or a partiality on behalf of . . . ARCO over and against the interest of either Mr. Kearney or the remainder beneficiaries . . . . The appropriate totality appears to be in this situation, a rising tide lifts all the boats.
> Kearney has made an increased distribution of over 800 percent through one of the worst recessions this country has ever seen . . . .
> The Abruzzos do not control the board. There is not a single incident in which it was shown they had their way or forced their agenda onto anyone else . . . .

> The fact that ARCO has grown as large over these last 15 years has . . . made the whole pie bigger and everybody's slice bigger. How that could translate to a reasonable jury into an award of damages of any particular amount, let alone 7-some-odd million dollars, does not compute to the Court . . . .

On December 22, 2015, Judge Malott awarded the Abruzzos $510,000 in fees, $35,700 in gross receipts tax, and $120,215.69 in costs.

On April 7, 2017, Judge Malott sanctioned Debtor $100,000, for, inter alia, willfully disobeying a confidentiality order.

Over four days in April 2017, Judge Malott tried the Abruzzos' counterclaims. He issued extensive findings and conclusions on July 7, 2017, including:

> After testifying directly at trial, Mr. Kearney failed to appear for cross-examination and proffered a medical excuse which has never been substantiated in any manner.
> Mr. Kearney admitted that it is a violation of the Trusts' spendthrift clause to promise people payment from the Trusts.
> Mr. Kearney's repeated violations of the Confidentiality Orders and attendant disclosure of both ARCO's discrete financial information as well as information about the Trust assets and operation was a breach of trust.
> The record is replete with Kearney's repeated breaches of his duty as a trustee through self-dealing with third parties, improper disclosures of financial information, and attendant violations of the orders of this court, as well as the clear indication that future litigation will ensure [sic], notwithstanding his resignation as a trustee.
> The court has already found that Mr. Kearney has significant credibility issues. Nothing at trial assuaged those issues.
> Clear and convincing evidence exists that Mr. Kearney is unable to successfully manage his financial life on the trust distributions he receives, and is significantly in debt.
> Mr. Kearney did not participate in a December 2016 mediation in good faith and should pay the full costs of the mediation.

Debtor filed this bankruptcy case on September 1, 2017. The United States Trustee's office appointed the UCC on November 22, 2017. On December 21, 2017, the Court granted Debtor's

motion to extend the "exclusivity" period of § 1121(c)(3)[2] until June 12, 2018.

Debtor filed the application to employ RCT on March 2, 2018. The application was served electronically on counsel for the UST and the UCC. It was not, however, "noticed out" with a deadline to object to the application. The application sought approval of a contingent fee, which included a fee of 25% of any "Gross Recoveries" obtained before a lawsuit is filed. "Gross Recoveries" is defined as:

> the fair value of all monetary consideration and non-monetary consideration received by the Debtor and the bankruptcy estate in connection with any settlement, judgment, award, or other recovery related to the Claims.

"Claims" is defined as:

> Causes of action, including derivative claims by the Debtor on behalf of the Debtor's two testamentary trusts, against the following (collectively, the "Claims"): (1) Louis Abruzzo; (2) Benjamin Abruzzo; (3) Nancy Abruzzo; and (4) Alvarado Realty Company. The scope of this representation shall not include: (1) the pending state court proceedings between and among the Debtor, Louis Abruzzo, and Benjamin Abruzzo; and (2) any other claim or matter unless we agree to expand the representation to include additional claims or matters pursuant to a written amendment to this Letter of Engagement.

On April 2, 2018, Debtor filed a plan of reorganization, the cornerstone of which was litigation against the Abruzzos and ARCO. Debtor also filed a motion to further extend his exclusivity period.

The Court entered an order granting the RCT employment application on April 4, 2018.

On April 30, 2018, the UCC objected to Debtor's second motion to extend exclusivity, stating that "while negotiations for a consensual plan are proceeding and could possibly result in a plan which the UCC could support, the UCC wishes to keep its options open to propose its own plan, or support another plan."

---

[2] All statutory references are to 11 U.S.C.

The Court held a hearing on the extension motion on May 9, 2018. At the end of the hearing, the Court denied the extension motion.

The UCC filed a competing plan of reorganization on July 12, 2018. Unlike Debtor's plan, the UCC plan was not a litigation plan. Rather, it was premised on certain changes to the MPK Trusts, namely:

> 1. That ARCO pay the sum of $12,571,799 to the MPK Trusts in exchange for all ARCO shares held by the trusts;
> 2. That the Trustees pay $3,000,000 to Debtor, who then delivers it to the Creditor Trustee (as defined in the UCC Plan); and
> 3. The Allowed Priority Tax Claim of the IRS of $350,890.55 be paid over a period of five years from the Petition Date-on or before September 1, 2022-in February and August of each year, from the net income that would otherwise be distributable to Mr. Kearney from the MPK Trusts.

(the "Trust Modifications"). The UCC Plan proposed settled all Debtor and estate claims against ARCO, the Abruzzos, Nancy Abruzzo, Rico Abruzzo, and counsel, agents, officers, directors, etc.

On August 13, 2018, Debtor filed a Fourth Plan of Reorganization. Like his earlier plans, the fourth plan continued to have litigation against the Abruzzos and ARCO as the centerpiece, particularly derivative claims against ARCO for shareholder oppression, breaches of controlling shareholders' fiduciary duties, unjust enrichment, and statutory violations. In addition, Debtor reserved the right to pursue a broad range of claims[3] against a large number of people, including many associated with ARCO, the Abruzzos, or the UCC.[4]

---

[3] More than 50 contract, tort, or statutory claims are listed.

[4] All . . . entities and individuals that owed fiduciary duties to the Debtor from August 31, 2007, to the present . . . all members of the Creditors Committee . . . any entity or individual responsible or who contributed to any losses or damages suffered by the Debtor or its creditors, or any party that has appeared in the Bankruptcy Case . . . Betty and Clayton White; Brenda Johnson; Nick Tarlson; Pete Domenici; Domenici Law Firm, P.C.; Kevin Yearout; C. Lian Yearout; Moss Adams LLP; Modrall, Sperling, Roehl, Harris & Sisk, P.A.; Marjorie A. Rogers; Paul Fish; Donald DeCandia; Mary Pat Abruzzo; Rico Abruzzo; Debbie Johnson; Louis Abruzzo; Benjamin Abruzzo; Nancy Abruzzo; Marty Holland; Tom Growney; John Chaves; All current and former

The Trust Modifications proposed in the UCC plan required the approval of Judge Malott. The Court granted stay relief so the parties could obtain a hearing before Judge Malott and present the proposed Trust Modifications. In an order entered on October 31, 2018, Judge Malott approved the Trust Modifications, finding, inter alia:

> the Court approves the transactions contemplated by "The Three Issues," as more specifically detailed herein, because those actions, and each of them, are fair, reasonable, and proper under the totality of the circumstances and are ultimately in the best interests of all the beneficiaries.
>
> It takes no speculation to conclude that Mr. Kearney's litigious approach has an adverse effect on the Trust, the operations of ARCO - the stock of which is the Trust corpus - and the fair market value of ARCO stock. After all, who wouldn't [sic] want to buy stock in a small corporation facing protracted litigation - described by Bankruptcy Court Judge Thuma as rife with "difficulties and red flags" as to both the claims and Kearney's motivations in bringing them - with attendant expense and diversion of the corporation's energy and assets?
>
> The Trustees are fulfilling their fiduciary duty in attempting to support the UCC Plan which provides a solution to Mr. Kearney's financial problems rather than exacerbating those problems as the Kearney Plan does.
>
> ARCO shareholders have willingly sold, at arm's length, their shares to ARCO since ARCO's creation thirteen years ago. Sales by shareholders of ARCO's predecessors at arm's length date back many years before that. Presently, ARCO has bought from willing sellers their minority interests at $79,000.00 per share. $79,000.00 per share is the same price that the UCC Plan proposes that ARCO purchase the ARCO shares from the Trusts.
> . . .
> There have been no actual offers to purchase except the pending offer from ARCO. The proposed amount of $12,571,799.00 at $79,000.00 per share owned by the Trusts is the fair market value of the ARCO stock owned by the Trusts.
>
> The ARCO re-purchase offer of $12,571,799.00 is fair and reasonable under the totality of the circumstances giving consideration to the minority nature of the stock interest, the restriction on sale due to ARCO's right of first refusal, and the negative effect on the attractiveness of investing in ARCO caused by Mr. Kearney's continuing litigation, and plans for further litigation.
>
> Clear and convincing evidence exists that the settlor Mary Pat Abruzzo Kearney did not anticipate the level of discord, distrust, acrimony, damages, and potential damage that exists related to Mr. Kearney's distributions from the Trusts based upon the ARCO dividends paid to the Trusts.

---

shareholders . . . officers and directors . . . and . . . agents and advisors of Alvarado Realty Company.

> Clear and convincing evidence exists that the continued retention by the Trusts of the ARCO stock will lead to further strife which is directly contrary to the anticipation of and desires of the settlor Mary Pat Abruzzo Kearney.
> Because clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the retention of the ARCO stock in the Trusts would cause the foregoing, modification of the Trusts is appropriate under §46A-4-412.
> The payment by the Trustees of $3,000,000.00 from principal to Mr. Kearney, with him then being required to deliver it to the Creditor Trustee as proposed, is a proper action by the Trustees and is in accordance with their fiduciary duties to Mr. Kearney and to all beneficiaries.
> The Trusts should be modified to allow, on a one-time basis, the payment by the Trustees of the $3,000,000.00 from principal to Mr. Kearney as provided in the Trust Modifications.
> The transactions contemplated by "The Three Issues" are actions within the scope of the Trustees' powers and responsibilities as authorized by The MPK Testamentary Trust.
> The transactions contemplated by "The Three Issues" are approved by the Court as appropriate and proper under the totality of the circumstances and are in the best interests of all the beneficiaries, including the remaindermen.
> . . .
> The MPK Testamentary Trusts should be modified, and hereby are so modified, to allow the Trustees to make a one-time $3,000,000.00 distribution from principal to Mr. Kearney, but only upon approval of the pending UCC Plan by the Bankruptcy Court.

The Court confirmed the UCC Plan on February 28, 2019, over Debtor's objections. RCT assisted Debtor in opposing the UCC Plan. Debtor appealed the order to the Tenth Circuit Bankruptcy Appellate Panel and then to the Tenth Circuit. The Tenth Circuit affirmed the confirmation order on February 24, 2021. The United States Supreme Court denied Debtor's petition for writ of certiorari on December 13, 2021. The transactions contemplated under the UCC Plan were consummated shortly thereafter.

## II. Discussion

A. <u>RCT's Employment Application Did Not Require Notice to Creditors</u>.

Unlike most motions and all fee applications, employment application are not required to be "noticed" to creditors, with a specified deadline to object. *See* § 327(a); Fed. R. Bankr. P. ("Rule") 2002; and Rule 2014. Instead, the only requirements are that the applications be filed and

-7-
Case 17-12274-t11    Doc 1258    Filed 03/25/22    Entered 03/25/22 15:33:56 Page 7 of 12

copies transmitted to the U.S. Trustee's office. Rule 2014(a). It is the nearly universal practice in this district to notice out employment applications, but there is no legal requirement to do so.

In addition, Debtor's counsel waited a month before submitting the order approving RCT's employment to the Court, during which time the parties most active in the case were well aware of the application. There were no procedural infirmities or inequities in the entry of the order.

B.  <u>RCT's Contingent Fee Terms Are Not Subject to § 330's "Reasonableness" Standard</u>.

The UCC and the U.S. Trustee's office argue that the Court should review RCT's final fee application under the "reasonableness" standard of § 330(a). That argument must be overruled.

Professionals in bankruptcy cases are usually paid by the hour and their fee applications are subject to a "reasonableness" review under §330(a). *See, e.g., In re Market Center East Retail Property, Inc.*, 730 F.3d 1239, 1245 (10th Cir. 2013). An alternative is to have other terms and conditions of retention, e.g., payment on a contingent fee basis, pre-approved under § 328(a). *Market Center*, 730 F.3d at 1245 n.5. Sometimes it is difficult to tell from reading a contingent fee employment application and order whether the fee arrangement was pre-approved under § 328(a) exclusively, or was also made subject to a § 330(a)(1) reasonableness review. When the application and order are unclear on this point, courts generally err on the side of preserving the right to review an applicant's fee for "reasonableness." *See, e.g., Zolfo, Cooper & Co. v. Sunbeam-Oster Co.*, 50 F.3d 253, 262 (3d Cir. 1995); *In re Circle K Corp*, 279 F.3d 669, 674 (9th Cir. 2002).

Here, the application and order are clear: RCT's proposed contingent fee was pre-approved under § 328(a) and is not subject to a reasonableness review under § 330. While the order mentions § 330, it is only to say that RCT will be compensated in accordance with "the *procedure* set forth in 11 U.S.C. §§330 and 331" (italics added). The first clause of the first sentence of § 330(a)(1) describes the procedure for obtaining a final fee award, while § 330 outlines the procedure for

obtaining an interim compensation award. Perhaps the reference in the RCT employment order to § 330 was not strictly necessary, even somewhat ill-advised, but the employment application and order are clear enough.

In cases like this one, where a contingent fee arrangement was pre-approved by the Court without reserving the right to subject the fee application to a § 330 reasonableness review, no such review is permitted. *See, e.g., Market Center*, 730 F.3d at 1245 n.5 (citing *In re Pilgrim's Pride Corp.*, 690 F.3d 650, 666-67 (5th Cir. 2012), the Tenth Circuit stated that "if prior approval is given to certain compensation, § 328 controls and the court starts with that approved compensation, modifying it only for developments unforeseen when originally approved"); *In re B.U.M. Int'l, Inc.,* 229 F.3d 824, 829 (9th Cir. 2000) ("[t]here is no question that a bankruptcy court may not conduct a § 330 inquiry into the reasonableness of the fees and their benefit to the estate if the court already has approved the professional's employment under 11 U.S.C. § 328"); *In re Smart World Technologies, LLC*, 552 F.3d 228, 232-33 (2d Cir. 2009) (quoting *B.U.M.*); *In re Barron*, 225 F.3d 583, 585-86 (5th Cir. 2000) (a professional may avoid uncertainty about compensation by obtaining pre-approval under § 328(a); if such approval is given, the compensation can only be changed if the "improvident" proviso in § 328(a) is invoked.

C. <u>There are Fact Issues about Whether § 328(a)'s "Improvident Proviso" Should be Invoked</u>.

The "Improvident Proviso" of § 328(a) provides:

> Notwithstanding such terms and conditions, the court may allow compensation different from the compensation provided under such terms and conditions after the conclusion of such employment, if such terms and conditions prove to have been improvident in light of developments not capable of being anticipated at the time of the fixing of such terms and conditions.

Changing the pre-approved terms and conditions of employment under the Improvident Proviso is not something to be done lightly. *See, e.g., In re ASARCO, L.L.C.*, 702 F.3d 250, 257-

58 (5th Cir. 2012) (citing cases holding that the Improvident Proviso is a "high hurdle" or "high standard"). "Section 328(a)'s establishment of such a "high hurdle" was no accident. Congress enacted § 328(a) to eliminate the previous uncertainty associated with professional compensation in bankruptcy proceedings, even at the risk of potentially underpaying, or, conversely, providing a windfall to, professionals retained by the estate under § 328(a)." *ASARCO*, 702 F.3d at 258, citing *In re Coho Energy Inc.*, 395 F.3d 198 (5th Cir. 2004). The fact that a case turns out to be a "slam dunk," that the court did not anticipate such a substantial recovery, or that a judgment was collected with "relative ease" are not enough to invoke the Improvident Proviso. *Coho Energy*, 395 F.3d at 205, quoting *Barron*, 325 F.3d at 694.

The circumstances here are unusual. When the Court approved RCT's employment, the UCC had not objected to a further extension of exclusivity, was still negotiating with Debtor, and had not filed a competing plan. The proposed Trust Modifications had not been docketed or otherwise made part of the record. The general understanding of the parties and the Court was that, if the Claims were settled and RCT claimed a contingent fee, the Abruzzos and/or ARCO would write a check to the estate. That is not how things turned out. Instead, the MPK Trusts were modified, ARCO bought all its stock owned by the trusts, and the trusts distributed $3,000,000 of their *res* to the bankruptcy estate. No money was paid by the Abruzzos or ARCO. Furthermore, it was the UCC rather than RCT that obtained the trust distribution for the estate.

The Court needs additional facts to determine whether to invoke the Improvident Proviso. The Court would expect testimony from, inter alia, RCT and counsel for the UCC, the Abruzzos, the US Trustee's office, and ARCO about whether the Court and the parties could reasonably have anticipated a $3,000,000 principal payment from the MPK Trusts to the estate, distributed for the

-10-
Case 17-12274-t11    Doc 1258    Filed 03/25/22    Entered 03/25/22 15:33:56 Page 10 of 12

stated purpose of paying Debtor's creditors, and whether the Court and the parties could reasonably have anticipated that RCT would claim a right to a 25% contingent fee on that distribution.

D. <u>Whether the $3,000,000 is a "Gross Recovery" on "Claims" is a Disputed Material Fact</u>.

Because the Court may or may not invoke the Improvident Proviso, it will need to take evidence on at least four issues relating to whether RCT is entitled to the claimed 25% contingent fee on the $3,000,000 trust fund distribution.

First, there is a question whether the $3,000,000 was paid to settle "Claims." The UCC asserts that the MPK Trusts made the $3,000,000 distribution to Debtor so he could pay creditors and discharge $5,000,000 of unsecured debt. Under this view, the Trust Modifications were primarily designed to get Debtor's financial house in order, pay his back taxes,[5] and leave him with a substantial income for life. RCT disagrees with this characterization, contending that the $3,000,000 was paid to settle the Claims.

A second, related issue is whether and to what extent it matters that the $3,000,000 came from the *res* of the MPK Trusts, not from ARCO or the Abruzzos.

Third, the UCC argues that even if a portion of the $3,000,000 comes within the definition of Gross Recovery, it would only be a small fraction of the total. If the Court accepted this argument, it would have to allocate the trust distribution among the Claims, the settlement of other claims,[6] and the payments to creditors/

Lastly, there is the question whether it makes a difference that the UCC, rather than RCT, pulled the laboring oar in obtaining the trust distribution.

---

[5] Judge Malott found that Debtor had not paid federal or state income taxes on his trust distributions from 2007-2017.

[6] For example, the State Court Action, adversary proceeding 18-1031, and claims against some of the "Released Parties" as defined in the UCC plan.

Counsel should present evidence and argument on these points at a final hearing.

### III. Conclusion

The order approving RCT's employment application was procedurally sound. RCT's contingent fee arrangement with the estate was approved unambiguously under § 328(a). Whether the terms and conditions of RCT's employment should be changed under the Improvident Proviso, and whether and/or how much of the $3,000,000 can fairly be considered "Gross Recoveries" to which RCT would be entitled to a 25% contingent fee, raise fact issues that must be resolved at a final, evidentiary hearing.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: March 25, 2022
Copies to: Counsel of Record