UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

VICTOR P. KEARNEY,　　　　　　　　　　　　　　　　Case No. 17-12274-t11

　　　　Debtor.

# OPINION

　　　　Before the Court are nine motions filed by the debtor, pro se, after a chapter 11 plan was confirmed and substantially consummated in this case. The case is ready for the entry of a final decree. To clean up the docket in anticipation of case closure, the Court will address the pending motions, none of which have or ever had merit, and all of which will be denied.

A.　　Facts.

　　　　For the purpose of ruling on the motions, the Court finds:[1]

*Creation of the Mary Pat Kearney Trusts*

　　　　Benjamin and Pat Abruzzo developed the Sandia Peak Ski Area and the Sandia Peak Tramway, both owned by their company Alvarado Realty Company ("ARCO"). The Abruzzos died in a plane crash in 1985, survived by their children Louis, Benny, Richard, and Mary Pat. The children took over management of ARCO after their parents' death.

　　　　Mary Pat Abruzzo married the Debtor in 1988, when she was 22 years old. She executed a last will and testament on July 8, 1988.

---

[1] The Court took judicial notice of the docket in the main case and all adversary proceedings. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (holding that a court may *sua sponte* take judicial notice of its docket); *LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.)*, 196 F.3d 1, 8 (1st Cir. 1999) (same). Many of the findings are from the Court's opinion confirming the UCC Plan (defined below).

Mary Pat Kearney died in 1997, age 31. At the time of her death, she owned about 18.5% of ARCO's stock. Under her will, the stock was bequeathed to two testamentary trusts (together, the "MPK Trusts" or the "Trusts") for the benefit of the Debtor during his lifetime. Upon Debtor's death, the corpus of the Trusts is to be distributed to Louis, Benny, and Richard Abruzzo or their children.[2] Ms. Kearney's will appointed Louis and Benny Abruzzo (the "Abruzzos") and Debtor as co-trustees of the MPK Trusts. They have all since resigned; Zia Trust, Inc. is now the sole trustee of the Trusts.

*The State Court Action*

Despite substantial distributions from the MPK Trusts (about $800,000 per year or $16,000,000 in total), relations between the Debtor and the Abruzzos soured. In 2013, the Debtor sued the Abruzzos in New Mexico state court, cause no. D-202-CV-2013-07676 (the "State Court Action"), alleging that they had breached their fiduciary duties by, inter alia, suppressing dividends paid by ARCO to the MPK Trusts.[3] The Abruzzos later filed a counterclaim for breach of fiduciary duty, to modify the trusts, and for other relief. The action was assigned to the Hon. Alan Malott.

Judge Malott presided over a five-day jury trial of Debtor's claims against the Abruzzos in June and July 2015. On July 6, 2015, Debtor rested his case[4] and the Abruzzos moved for a directed verdict.[5] Judge Malott directed a verdict dismissing Debtor's claims against the Abruzzos. Judge Malott made the following findings of fact in open court:

> There has been no substantial evidence that the Abruzzos in fact control ARCO.
> … I see no evidence of actual control.

---

[2] Richard Abruzzo died in December 2010.
[3] ARCO's policy was to dividend 70% of its profits and retain 30%.
[4] Debtor was scheduled to be cross examined on the afternoon of July 6, but failed to appear in court, complaining of medical problems.
[5] Part of the evidence upon which the Abruzzos relied, and which the Court finds significant, is that ARCO's dividend policy had been set before the Debtor married Mary Pat and had not changed after her death.

> I don't find that the Abruzzos misused any control they may have had in this circumstance. The totality on which the entire Plaintiff's case rests is if it's good for ARCO, it must be bad for Victor Kearney. That's not the law; that's not the evidence in this case.
> . . . [T]he Abruzzos' efforts on behalf of ARCO . . . have been . . . extremely successful . . . The fact that the Abruzzos have run their company properly does not translate into a starvation or a partiality on behalf of . . . ARCO over and against the interest of either Mr. Kearney or the remainder beneficiaries. . . The appropriate totality appears to be in this situation, a rising tide lifts all the boats.
> Kearney has made an increased distribution of over 800 percent through one of the worst recessions this country has ever seen. . .
> The Abruzzos do not control the board. There is not a single incident in which it was shown they had their way or forced their agenda onto anyone else. . .
> The fact that ARCO has grown as large over these last 15 years has . . . made the whole pie bigger and everybody's slice bigger. How that could translate to a reasonable jury into an award of damages of any particular amount, let alone 7-some-odd million dollars, does not compute to the Court. . .
> . . .

The Abruzzos asked for attorney fees under NMSA § 46A-10-1004 ("In a judicial proceeding involving the administration of a trust, the court, as justice and equity may require, may award cost and expenses, including reasonable attorney fees, to any party…."). On December 22, 2015, Judge Malott ruled that justice and equity required that the Abruzzos recover $510,000 in fees, $35,700 in gross receipts tax, and $120,215.69 in costs. Judge Malott ordered the Debtor to pay 75% of these amounts, and the MPK Trusts to pay 25%.[6] The order contains the following:

> Plaintiff argues that Defendants should not be allowed to recover fees incurred in Defendants' opposition to his attempts to obtain corporate documents and information from ARCO, the separate, closely held, corporation involved in this matter but not a party hereto. A significant pillar of Plaintiff's case was his claim that his status as a Trustee and Life Income Beneficiary under his deceased wife's Trust entitled him to effect [sic] the management of ARCO from which the Trust's income flows. Another pillar was his claim that Defendants operated ARCO so as to profit ARCO more than the Trust and, therefore, to minimize income to Plaintiff. While Plaintiff was allowed to obtain some, but not all, the corporate information and documentation he sought, he was not successful in establishing his core charges that Defendants managed ARCO to his financial detriment. The fees incurred in

---

[6] Judge Malott clarified in a subsequent order entered on April 20, 2016, that the portion of fees paid by the MPK Trusts should "be paid to Defendants by the Trusts from its current principal holdings."

> context of the ARCO document discovery dispute are a reasonable and necessary part of this overall litigation.
>
> . . .
>
> While there is no substantial evidence that Plaintiff brought this action without at least an honest belief in the merits of this argument, it is also indisputable that Plaintiff was, after two (2) years of litigation, not able to support his allegations with substantial evidence at trial. While Plaintiff believes he "had legitimate claims against the Defendants" which "survived vigorous summary judgment motions" . . . Plaintiff could not, and did not, prove those claims at trial.

On April 7, 2017, Judge Malott sanctioned Debtor $100,000, finding:

> Substantial evidence was adduced that Victor Kearney has engaged in significant dishonesty and made numerous false statements, both under oath and not, including but not limited to first claiming he and Mary Pat Abruzzo Kearney were domiciled in New Mexico at her death, then later claiming they were domiciled in Nevada; in his divorce proceedings, Mr. Kearney clearly falsely represented his income to gain an advantage in child support determination; in the first phase of trial in this case, Mr. Kearney testified that his obligations regarding state and federal income taxes were current when in fact he had not filed tax returns for a number of years.
>
> Substantial evidence was adduced that Mr. Kearney has also disobeyed and disregarded lawful Orders of this Court in this litigation including Orders directed at his discovery obligations as well as the specific Confidentiality Order, and verbal confidentiality instructions entered by the Court during the course of this litigation.
>
> Overall, Debtor has impressed the Court as an individual who bears no allegiance to the truth, but who will say whatever he thinks will achieve his goals. He has little or no credibility. Further, Debtor has repeatedly exhibited bad faith non-compliance with his discovery obligations throughout this litigation both generally and by failing to comply with specific discovery orders. In short, Debtor's conduct amounts to an affront to this particular Court and to the entire judicial process.

Judge Malott ordered that the sanction be deducted from distributions otherwise payable to Debtor from the MPK Trusts.

Over four days in April 2017, Judge Malott tried the Abruzzos' counterclaims. He issued extensive findings and conclusions on July 7, 2017, including:

> A trial on the merits was held on June 29, 30, July 1, 2, and 6, 2015.
> After testifying directly at trial, Mr. Kearney failed to appear for cross-examination and proffered a medical excuse which has never been substantiated in any manner.

After the close of Mr. Kearney's case, the Court granted Defendants' motion for a judgment as a matter of law on [all claims].

The court granted the Defendants attorney's fees in the amount of $510,000 plus Gross Receipts Tax.

The court also awarded $120,215.69 in costs.

Mr. Kearney admitted that it is a violation of the Trusts' spendthrift clause to promise people payment from the Trusts.

Mr. Kearney's repeated violations of the Confidentiality Orders and attendant disclosure of both ARCO's discrete financial information as well as information about the Trust assets and operation was a breach of trust.

The record is replete with Kearney's repeated breaches of his duty as a trustee through self-dealing with third parties, improper disclosures of financial information, and attendant violations of the orders of this court, as well as the clear indication that future litigation will ensure [sic], notwithstanding his resignation as a trustee.

The court has already found that Mr. Kearney has significant credibility issues. Nothing at trial assuaged those issues.

Clear and convincing evidence exists that Mr. Kearney is unable to successfully manage his financial life on the trust distributions he receives, and is significantly in debt.

Mr. Kearney did not participate in a December 2016 mediation in good faith and should pay the full costs of the mediation.

The parties have reached a level of discord, distrust, and distaste such that it would be difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to serve appropriately as Trustees, compensated or uncompensated, into the foreseeable future.

Kearney's conduct has resulted in a toxic relationship between the parties which adversely impacts the operation of the Trust and makes it difficult or impossible for Louis Abruzzo or Benjamin Abruzzo to effectively serve as Trustee.

Clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the facts and circumstances shown by the evidence of this case, and that modification of the Trust is appropriate under 46A-4- 412 NMSA.

Good cause, upon clear and convincing evidence, exists for modification of the Mary Pat Abruzzo Kearney Trust, including but not limited to appointment of a Successor Trustee and establishment of directives for further administration of the Trust and its assets in a manner which will effectively protect all beneficiaries equally.

*The Bankruptcy Case*

Debtor filed this bankruptcy case on September 1, 2017, on the eve of a hearing in the State Court Action on a potential successor trustee for the MPK Trusts.

The United States Trustee's office appointed an Unsecured Creditors' Committee ("UCC") on November 22, 2017. On December 21, 2017, the Court granted Debtor's motion to extend the "exclusivity" period of § 1121(c)(3) until June 12, 2018. Debtor and the UCC attempted over the next several months to agree on the terms of a plan.

On April 2, 2018, Debtor filed a plan of reorganization and a motion to further extend his exclusivity period. The UCC, unsuccessful in negotiations with the Debtor, objected. The Court denied the motion.[7]

The UCC filed a competing plan of reorganization on July 12, 2018 (as modified, the "UCC Plan").[8] The UCC plan was premised on certain changes to the MPK Trusts, namely:

1. That ARCO pay the sum of $12,571,799 to the MPK Trusts in exchange for all ARCO shares held by the trusts;
2. That the Trustees pay $3,000,000 to Debtor, who then delivers it to the Creditor Trustee (as defined in the UCC Plan); and,
3. The Allowed Priority Tax Claim of the IRS of $350,890.55 be paid over a period of five years from the Petition Date-on or before September 1, 2022- in February and August of each year, from the net income that would otherwise be distributable to Mr. Kearney from the MPK Trusts.

(the "Trust Modifications"). The Trust Modifications required approval of the state court. The UCC Plan settled all Debtor and estate claims against ARCO, the Abruzzos, and others in exchange for the $3,000,000.[9]

Debtor reacted to the UCC Plan with outrage and threats. Debtor argued that the UCC, the Abruzzos, ARCO, and others were engaged in an illegal scheme to violate state trust law and deprive him of his rights under the MPK Trusts. He accused many people of breaching their

---

[7] Debtor appealed the denial, the first of many appeals Debtor filed in this case.
[8] The Debtor also continued to file amended plans, the last of which, his seventh amended plan, was filed January 22, 2019.
[9] In contrast, the cornerstone of all Debtor's plans was pursuit of more litigation against ARCO, the Abruzzos, and others.

Case 17-12274-t11    Doc 1402    Filed 07/28/23    Entered 07/28/23 12:09:40 Page 6 of 20

fiduciary duties to him by pursuing the UCC Plan. He sued the Abruzzos for breach of duty. Debtor's response showed his mistaken belief that only he should be allowed to control the reorganization process, whatever the cost, delay, or acceptability of payment proposals.

On August 30, 2018, the Abruzzos filed a motion for relief from stay, seeking permission to ask Judge Malott for a hearing on the Trust Modifications. The Court granted the motion. Judge Malott provided an October 3, 2018, hearing date.[10] The Abruzzos then filed a supplemental stay relief motion so the hearing could proceed. The Court granted the stay motion on September 18, 2018, over Debtor's objection.

*State Court Review of the Proposed Trust Modifications*

On October 2, 2018, the Debtor removed the State Court Action to the United States District Court for the District of New Mexico, alleging diversity of citizenship. The action was assigned to Judge Judith C. Herrera. She promptly transferred the action to this Court, holding:

> Kearney's diversity allegations are frivolous. The notice of removal claims, for the first time, that Kearney is a Nevada citizen. However, he filed the original lawsuit against the Abruzzos in New Mexico's Second Judicial District Court in 2013 and the New Mexico bankruptcy case in 2017… Kearney's attempt to remove the actions directly to this Federal District Court appears to be a sham litigation tactic to avoid a ruling by the Bankruptcy Court.[11]

The Court granted the Abruzzos' motion to abstain and remand on October 11, 2018. Judge Malott rescheduled the hearing on the Trust Modifications for October 23, 2018, and the hearing took place on that date. By an order entered October 31, 2018, Judge Malott approved the Trust Modifications, finding, inter alia:

> The evidence which has developed in this matter since June 2015 is clear and convincing that Mr. Kearney initiated this litigation with the purpose of damaging

---

[10] The original hearing date was September 27, 2018, but was moved at Debtor's request.
[11] Michelle Daskalos, Debtor's ex-wife, filed for divorce in 2015. In their November 18, 2015, marital settlement agreement, Debtor stated under oath that he had been a New Mexico resident more than six months before the petition was filed.

the Abruzzos individually and to foster his apparent plan to force a hostile takeover of the Abruzzo interests and the assets of ARCO by gaining access to financial and in-house information and documentation through discovery which he could not have accessed otherwise, and then disseminating such information to third parties in repeated violation of the court's orders and admonishments and in spite of significant monetary sanctions. . .

Article XVI [of Mary Pat Kearney's will] . . . Provides the Trustee may engage in the sale or disposition of Trust assets "irrespective of the occupancy by the same person of dual positions, to deal with itself in its separate, or any fiduciary, capacity."

. . . In this case, the terms of the MPK Testamentary Trust specifically waive the Trustees' conflicts of interest which may exist regarding "buying and selling assets" of the Trust. Article XVI (16).

Further, the Court approves the transactions contemplated by "The Three Issues," as more specifically detailed herein, because those actions, and each of them, are fair, reasonable, and proper under the totality of the circumstances and are ultimately in the best interests of all the beneficiaries.

It takes no speculation to conclude that Mr. Kearney's litigious approach has an adverse effect on the Trust, the operations of ARCO - the stock of which is the trust corpus - and the fair market value of ARCO stock. After all, who wouldn't [sic] want to buy stock in a small corporation facing protracted litigation - described by Bankruptcy Court Judge Thuma as rife with "difficulties and red flags" as to both the claims and Kearney's motivations in bringing them - with attendant expense and diversion of the corporation's energy and assets?

The Trustees are fulfilling their fiduciary duty in attempting to support the UCC plan which provides a solution to Mr. Kearney's financial problems rather than exacerbating those problems as the Kearney plan does.

. . .

The ARCO re-purchase offer of $12,571,799.00 is fair and reasonable under the totality of the circumstances giving consideration to the minority nature of the stock interest, the restriction on sale due to ARCO's right of first refusal, and the negative effect on the attractiveness of investing in ARCO caused by Mr. Kearney's continuing litigation, and plans for further litigation.

Clear and convincing evidence exists that the settlor Mary Pat Abruzzo Kearney did not anticipate the level of discord, distrust, acrimony, damages, and potential damage that exists related to Mr. Kearney's distributions from the trusts based upon the ARCO dividends paid to the trusts.

Clear and convincing evidence exists that the continued retention by the trusts of the ARCO stock will lead to further strife which is directly contrary to the anticipation of and desires of the settlor Mary Pat Abruzzo Kearney.

Because clear and convincing evidence exists that Mary Pat Abruzzo Kearney did not anticipate the retention of the ARCO stock in the trusts would cause the foregoing, modification of the trusts is appropriate under §46a-4-412.

The payment by the trustees of $3,000,000.00 from principal to Mr. Kearney, with him then being required to deliver it to the creditor trustee as proposed, is a

proper action by the trustees and is in accordance with their fiduciary duties to Mr. Kearney and to all beneficiaries.

The trusts should be modified to allow, on a one-time basis, the payment by the trustees of the $3,000,000.00 from principal to Mr. Kearney as provided in the trust modifications.

The transactions contemplated by "the three issues" are actions within the scope of the trustees' powers and responsibilities as authorized by the MPK testamentary trust.

The transactions contemplated by "the three issues" are approved by the court as appropriate and proper under the totality of the circumstances and are in the best interests of all the beneficiaries, including the remaindermen.

The transactions contemplated by "the three issues" are not voidable transactions under section 46a-8-802.

The MPK testamentary trusts should be modified, and hereby are so modified, to allow the trustees to make a one-time $3,000,000.00 distribution from principal to Mr. Kearney, but only upon approval of the pending UCC Plan by the bankruptcy court.

*The Confirmation Hearing*

On November 13, 2018, the Court approved disclosure statements for the UCC Plan and the Debtor's sixth amended plan and set final confirmation hearings for both on January 31, 2019.

Plan voting ended on December 18, 2018. Unsecured creditors voted against Debtor's plan and in favor of the UCC Plan.[12]

Because general unsecured creditors voted against Debtor's plan, it appeared to violate the "absolute priority rule" of § 1129(b)(2)(B)(ii). *See In re Stephens*, 704 F.3d 1279, 1286-87 (10th Cir. 2013). The Court had asked Debtor's counsel about this potential problem for months. On January 22, 2019, Debtor filed a seventh amended plan which proposed, for the first time, to transfer all of Debtor's assets to a "plan administrator" and pay interest on unsecured claims. On

---

[12] Debtor plan: 71% of votes were against; 96% of dollars voted were against; UCC Plan: 84% of votes were in favor; 97% of dollars voted were in favor.

January 23, 2019, the Court ruled that plan could not be considered for confirmation on January 31, 2019, because the changes were too significant.[13]

The Court held a confirmation hearing on the UCC Plan on January 31 and February 1, 2019. Objections were filed by the Debtor, Ms. Daskalos, Wells Fargo, the IRS, New Mexico Taxation and Revenue Department ("NMTRD"), and U.S. Bank. By a stipulation reached just before the confirmation hearing but not filed until February 21, 2019 (the "Amendment Stipulation"), all objections except those of the Debtor and Ms. Daskalos were resolved.

Two of the three UCC committee members testified that shortly before the confirmation hearing they received phone calls from someone interested in buying their claims. The purpose was to take control of the UCC and force the withdrawal of the UCC Plan. The Court found that Debtor's bankruptcy counsel was not aware of this skullduggery and strongly advised against it when it was disclosed. The Court also found, however, that Debtor must have been aware of the

---

[13] Debtor's latest plan had serious problems. The main funding sources were litigation recovery and payments from the MPK Trusts. If the litigation had little or no net value, which seemed as likely as not, then it would take decades to repay unsecured creditors, if they were ever paid at all. Further, there would be no way for creditors to collect what they are owed because of the spendthrift provision of the trusts. Finally, the restrictions on Debtor's spending were loose and vague, leading to the possibility that he would not have to pay much to his creditors from trust distributions.

plan, and likely spearheaded it, adding to an already long list of his questionable or improper actions in the State Court Action and this bankruptcy case.[14]

*Plan Confirmation and Appeals*

On February 28, 2019, the Court entered an order confirming the UCC Plan. Debtor appealed the confirmation order.

On December 4, 2019, the Bankruptcy Appellate Panel (BAP) for the 10th Circuit affirmed the order. The BAP found that the Court did not deny the Debtor due process, made no errors in its findings of fact, and did not abuse its discretion in approving the settlement of the Debtor's claims against ARCO and the Abruzzos. Debtor appealed the BAP decision to the 10th Circuit Court of Appeals on December 12, 2019.

On February 24, 2021, the 10th Circuit affirmed the BAP and this Court. Debtor's petition for re-hearing en banc was denied in April, and his petition for certiorari to the United States Supreme Court was denied December 13, 2021.

*Substantial Consummation of the UCC Plan*

The Plan became effective on January 6, 2022. By June 30, 2023, the Creditor Trustee has disbursed $2,917,550. The Plan has been substantially consummated.

---

[14] These actions include: 1. Claiming that Mary Pat Abruzzo was a Nevada resident when she died; 2. Divulging confidential information obtained in the State Court Action to third parties, in violation of court orders; 3. Mediating in bad faith; 4. Failing and refusing to pay professional fees incurred in this case; 5. Failing to alter his expensive lifestyle or spending habits while a bankruptcy debtor; 6. Failing to appear and testify under oath in this case; 7. Changing his position about his state of residence in the State Court Action, his divorce case, this case, and the lawsuit he brought in Nevada; 8. Responding to the Court's order to pay professional fees by emptying his bank account; 9. Paying his home mortgage in violation of the automatic stay; 10. Changing his position about the value of his intellectual property; 11. Removing the State Court Action on the eve of trial; and 12. Filing a lawsuit in Nevada against the Abruzzos, ARCO, and others alleging breach of duty, on the eve of a hearing in state court that would determine that issue.

*The Creditor Trustee's Motion*

On June 21, 2022, the Creditor Trustee filed a Motion for Order Directing Initial Distribution and Confirming Whether the Creditor Trust is Responsible for Paying Certain Priority Tax Claims (the "Creditor Trustee Motion"). Two main issues were raised by the motion, viz., whether the Creditor Trust was required to pay Debtor's prepetition tax obligation to the IRS, and whether the Creditor Trust was obligated to pay Debtor' post-petition child support. The motion was fully briefed and argued. After a final hearing, the Court answered both questions in the negative.[15]

B. <u>Debtor's Pending Pro Se Motions</u>.

Debtor's bankruptcy counsel withdrew after the 10th Circuit affirmed the UCC Plan confirmation order. Counsel apparently disagreed with Debtor about the advisability of spending more time and money filing a frivolous petition for writ of certiorari with the United State Supreme Court. By then, it was obvious that the law firm's decision to represent Debtor in this case was a huge mistake.[16] Debtor has been unable to obtain new counsel. Nevertheless, Debtor filed, inter alia, the following motions pro se (together, the "Debtor Motions"):

- Request for Hearing to Discuss and Review the Material Information Herein that Pertains to All Parties that are or have been Involved in case no. 17-12274, etc. filed April 25, 2022, doc. 1282 ("Motion to Discuss and Review");

- Request for Hearing to Review the UCC Confirmed Plan 1/6/22, etc., filed June 27, 2022, doc. 1288 (the "Plan Review Motion");

- Request Motion for Review: Overreach Ruling from State of New Mexico Second Judicial District Court to United States Bankruptcy Court District of New Mexico., filed September 16, 2022, doc. 1321 ("Overreach Motion")[17];

---

[15] For a discussion of the Trusts' payment of the IRS prepetition claim, see Section E below.
[16] The firm charged the estate over $3,000,000 in fees and expenses, but agreed to accept $300,000 from the Creditor Trust in full satisfaction of its administrative expense claim.
[17] The Overreach Motion as two additional titles.

- Motion to Stay, filed October 11, 2022, doc. 1334 ("First Motion to Stay");

- Motion to Review Retention of Jurisdiction, filed October 12, 2022, doc. 1336 ("Jurisdiction Motion");

- Motion for Instruction on Tax Payment Responsibility, Per Judge Malott's 09/2019 Order [...] and Clarification of Correct Tax Payment Implementation Per the Unsecured Creditors Committee Plan "Issue 3," filed November 9, 2022, doc. 1349 ("Tax Payment Motion");

- Emergency Request for Judicial Review/Investigation to Bankruptcy Case by Department of Justice and New Mexico Attorney General, filed December 21, 2022, doc 1368 ("Judicial Review Motion");

- Motion to Stay, filed May 10, 2023, doc. 1380 ("Second Motion to Stay"); and

- Motion Requesting Your Recusal, etc., filed June 29, 2023, doc. 1392 ("Recusal Motion").

C. <u>Delivery of the Trust Payment to the Creditor Trust</u>.

Several of the motions[18] complain that the $3,000,000 Trust Payment was paid directly to the Creditor Trustee rather than using Debtor as an unpaid middleman. Issue number 2 of the Trust Modifications was:

> 2. That the Trusts will pay the Trust Payment (as defined in the UCC Plan) of $3,000,000.00 to Mr. Kearney who in turn shall deliver it to the Creditor Trustee (as defined in the UCC Plan)

Instead of paying the money to Debtor, the Trusts paid the $3,000,000 directly to the Creditor Trustee. Thus, Debtor was deprived of the benefit of acting as the middleman. Because of that, Debtor wants the Court to order the Creditor Trust give back the $3,000,000.

The Trusts skipped the "middleman" step because of the following language in Judge Malott's September 9, 2021, Order Appointing Successor Trustee:

> The co-trustees are directed to make payment from the proceeds of the sale of the ARCO stock directly to the Creditor trustee and Zia Trust, Inc., on behalf of the Plaintiff, Mr. Kearney.

---

[18] E.g., the Overreach Motion Jurisdiction Motion, and Judicial Review Motion.

Debtor's request for relief will be denied. It makes no difference whether the Trust Payment check went straight from the Trusts to the Creditor Trustee or was given to Debtor for a brief moment (three seconds? ten seconds?) before he handed it over to the Creditor Trustee. To the extent the state court order eliminated the purely ministerial delivery of the check to Debtor, Debtor was the primary beneficiary. Otherwise, he would have had to appear in Court to accept and deliver the check. If Debtor had performed as required, the event would have wasted time and money. On the other hand, if Debtor had refused to relinquish the check once it had been given to him, the Court would have been forced to hold him in civil contempt of court and order him incarcerated until he thought better of his refusal. Either way, no benefit would have accrued to Debtor.

D.  <u>Net Amount Held by the Trusts</u>.

Several of the Debtor Motions[19] complain about how much money remained in the Trusts after the Trust Modification transactions were completed and the $3,000,000 Trust Payment was made to the Creditor Trust. In various documents filed in this case and the state court case, estimates were made about the net funds the Trusts would have after selling the ARCO shares, paying associated taxes, and paying $3,000,000 to the Creditor Trust. The estimates were that about $8,000,000 would be left. Although the Court has no good evidence on this point, it appears that the actual net amount to the trusts was on the order of $7,500,000.[20] Debtor is unhappy about this difference and wants the Court to do something about it.

---

[19] E.g., the Plan Review Motion, Overreach Motion, First Motion to Stay, Jurisdiction Motion, Tax Payment Motion, Judicial Review Motion, and Second Motion to Stay.

[20] In the Plan Review Motion, Debtor alleged that "$8,051,799 should have gone to the Trusts after paying taxes on the sale of the ARCO stock and the $3,000,000 payment to the Creditor Trustee." Instead, Debtor alleged, "Prior Trustees Louis and Benny Abruzzo paid themselves $304,592.27 which reduced the MPAK Trust to $9,267,209.48. It is now claimed that the original UCC plan made a 16% accounting 'error' in estimated taxes, an underestimation of $250,000. Therefore, $1,750,000 (not $1,500,000 were paid to Federal and State tax board . . . $7,517,209.48 made it to MPAK trust when the plan was confirmed on 1/6/2022."

This Court has no jurisdiction over the Trusts or anything they did or were authorized to do. That was for the state court. All this Court and Debtor's creditors cared about was the receipt of $3,000,000 from the Trustee in exchange for broad releases and the Trusts' agreement to pay Debtor's prepetition debt to the IRS. Those matters were approved by the state court, which allowed the Plan to proceed to confirmation. If the transaction involving the trusts, ARCO, the Abruzzos, and the successor trustee did not proceed in accordance with the state court's orders, the matter must be taken up with the state court, not this Court. The Court lacks jurisdiction to adjudicate the issue.

Nevertheless, the Court will make two observations. First, the confirmed UCC Plan does not contain an estimate of the income tax liability of the Trusts if they sold their ARCO shares for $79,000 per share. Furthermore, the difference between $7,800,000 and $8,000,000 is not material in the grand scheme of things.

Second, the funds the Abruzzos allegedly took from the Trusts ($304,592.27) could have been owed to them because of Judge Malott's 2015 order requiring Debtor to pay the Abruzzos $665,000 in attorney fees, and/or the $100,000 sanctions order. The Court thinks it very unlikely the Abruzzos took any money without the legal right to do so. If they did, the state court, which has exclusive jurisdiction over the Trusts, is the court to petition for redress of that grievance.

E.  Payment of the IRS' Prepetition Tax Claim.

The Debtor Motions raise the issue of the Trusts' failure to pay Debtor's prepetition priority tax debt owed to the IRS.[21] The third of the Trust Modifications was:

> 3. That the Allowed Priority Tax Claim of the IRS be paid over a period of five (5) years from the Petition Date, in February and August of each year, from the net income that would otherwise be distributable to Mr. Kearney from the Trust.

---

[21] E.g., the Overreach Motion, Tax Payment Motion, and Second Motion to Stay.

The state court approved the proposed modification. The confirmed UCC Plan provides that the Trusts will pay the prepetition IRS claim as set forth in the modification.[22]

It came to light in the fall of 2022, when the Court addressed the Creditor Trustee Motion, that the Trusts had not been making the required payments to the IRS because they did not have enough net income to do so. The problem was resolved by going back to state court to obtain approval to pay the IRS claim from principal rather than income. To the Court's knowledge, the IRS claim has now been paid in full. Debtor's request that this Court take any action in connection with payment of the IRS' prepetition tax claim therefore is denied as moot.

F.  Document Requests.

Several of the Debtor Motions[23] ask for documents to be produced by somebody. However, there is no pending adversary proceeding or contested matter. Debtor did not comply with Fed. R Bankr. Pro. 2004 or the applicable discovery rules. No subpoenas were issued. No depositions duces tecum were noticed. Debtor cannot simply ask the Court to order unidentified persons produce documents and expect the request to be granted.

Also, it is very late in this case. Debtor cannot ask for document production to relitigate confirmation of the UCC Plan. Further, to the extent the documents sought are tax documents related to Debtor's pending criminal case, discovery should be conducted in that case, not the bankruptcy case. Finally, if Debtor is concerned about the proper handling of the Trusts, any discovery must be taken in state court.

All requests for documents production contained in the Debtor Motions will be denied.

---

[22] Debtor argues that the Plan never became "effective" because the Trusts did not timely pay the IRS pre-petition claim. That argument fails. The Effective Date was made contingent on state court approval of the payment of the IRS claim by the Trusts, not of actual payment.

[23] E.g., the Plan Review Motion, Overreach Motion, Tax Payment Motion, and Second Motion to Stay.

G. <u>Recusal</u>.

Debtor asks that the Court recuse itself from hearing this case, based on the fact that before August 2012, the Court was a member of the same law firm as UCC's counsel (Thomas D. Walker). The request will be denied.

Under Tenth Circuit law, "the moving party has a substantial burden in establishing the judge is not impartial." *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir.1992). The issue is governed by 28 U.S.C. § 455 and the Judicial Code of Conduct. Section 455 requires that a federal judge to recuse himself from any proceeding in which his impartiality might reasonably be questioned. The test is whether "a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality." *Hinman v. Rogers,* 831 F.2d 937 (10th Cir. 1987).

The Judicial Code of Conduct offers detailed guidance on this issue in its Compendium of Selected Opinions, which can be found in the Guide to Policy and Procedures. Ethics advisory opinion No. 24, § 3.3-1 provides that to avoid the appearance of impropriety, a judge must recuse in all cases handled by the former law firm until: (a) all payments due to the judge have been received; and (b) for a reasonable time after his appointment. The opinion goes on the suggest that a reasonable time is typically two years after appointment.

In this case, the Court received all payments due from Thuma & Walker by August 2012. The Court has been on the bench for eleven years. No impropriety, either appearance or actual, remains simply because Mr. Walker was a law partner more than a decade ago.

Furthermore, it is improper to seek recusal nearly six years after the case was filed. "Once a movant becomes aware of facts on which a motion to disqualify is predicated, even a relatively brief delay in filing the motion may result in a finding of untimeliness." *In re Haas*, 292 B.R. 167, 181 n. 8 (Bankr. S.D. Ohio 2003) (collecting cases); *see also S.E.C. v. Loving Spirit Foundation*

*Inc.*, 392 F.3d 486, 492-93 (D.C. Cir. 2004) (motion filed eight months after the rulings complained of is untimely); *U.S. v. Sykes*, 7 F.3d 1331, 1339 (7th Cir. 1993) (recusal motion must be filed at the earliest moment after the movant acquires knowledge of the facts demonstrating the basis for disqualification). Here, Debtor was represented between 2017 and 2021 by able counsel, who certainly knew about the facts of which Debtor now complains. Filing a recusal motion years later, after a plan of reorganization Debtor does not like has been substantially consummated, is outrageous. Even if there were any merit in the recusal motion, and there is none, it would have to be denied based on its extreme untimeliness.

The Recusal Motion will be denied.

H.  <u>Dismissal of the State Court Appeals</u>.

Debtor complains that there were ongoing state court appeals when the UCC Plan became "effective," and that the Creditor Trustee dismissed the appeals.[24] The complaint lacks merit. The UCC Plan clearly provides that, on the Effective Date, all Causes of Action relating to ARCO and the Abruzzos will be released. The defined term "Causes of Action" includes all appeals. All interested parties expected that the pending state court appeals would be dismissed on the Effective Date. That is what happened. Debtor's concerns or complaints related to the dismissal of the state court appeals are without merit.

I.  <u>Requests For Stay</u>.

Several of the Debtor Motions[25] ask the Court to stay all proceedings in the case indefinitely. Thus, the Judicial Review Motion asks for a stay until the "US Department of Justice and the New Mexico Attorney General" have "responded to what their next course of action will

---

[24] E.g., the Plan Review Motion, Overreach Motion, Jurisdiction Motion.

[25] E.g., the Motion to Discuss and Review, Overreach Motion, the First Motion to Stay, Jurisdiction Motion, the Tax Payment Motion, Judicial Review Motion, and the Second Motion to Stay.

be in regard to the egregious tax fraud perpetrated by ARCO and the ongoing, blatant miscarriage of justice perpetrated against Debtor throughout his case(s)." Similarly, the First Motion to Stay asks for a stay until Debtor can "retain neutral taxation counsil [sic] who will carefully provide an accurate assessment of Debtor's tax obligations directly related to Debtor's Bankruptcy case that will not run afoul with I.R.S. tax law, today or in the future." The Second Motion to Stay makes a similar request.

These motions are based on a faulty premise, i.e., that once the case has been closed, it cannot easily be reopened. In fact, cases are reopened all the time, if necessary to administer the estate. *See* 11 U.S.C. § 350(b) (case may be reopened "to administer assets, to accord relief to the debtor, or for other cause."); *see also In re Mendoza,* 595 B.R. 849, 856 (10th Cir. BAP 2019) (court has duty to reopen if case has not been fully administered); and *In re Morgan*, 2020 WL 1923617 (Bankr. D. Utah) (same).

Furthermore, Debtor does not need a stay of this bankruptcy case to retain a tax lawyer. He can do that at any time.

Finally, if the New Mexico Attorney General or the U.S. Department of Justice wish to launch an investigation, about which the Court is highly doubtful, they may do so at any time, whether this case has been fully administered and closed or not. No stay is necessary to allow any such investigation to take place.

Debtor's requests for a stay lack merit and will be denied.

## Conclusion

Prepetition, Debtor dug himself into a very deep hole, financially and otherwise. It was hoped that Debtor might use the bankruptcy process to extricate himself. It eventually dawned on his creditors, however, that Debtor's bankruptcy plan was to keep digging: he proposed only to

pay creditors if he struck gold in his relentless pursuit of the Abruzzos. The UCC did not like the "keep on digging" plan and proposed an alternative. After much litigation, the UCC Plan was confirmed and upheld by the Tenth Circuit BAP and the Tenth Circuit, and denied certiorari by the Supreme Court. It was and still is the Court's opinion that the UCC Plan was in the Debtor's best interests and provided a way, perhaps the only way, for Debtor to climb out of his hole and start afresh. Debtor vehemently disagrees with this assessment. That is unfortunate but not surprising.

The UCC Plan has now been substantially consummated. Debtor's estate has been fully administered, post-confirmation, in accordance with the UCC Plan and the Bankruptcy Code. The relief requested in the Debtor Motions either is moot or lacks merit. The Court will enter separate orders denying the requested relief.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: July 28, 2023

Copies to: Counsel of Record

Victor Kearney
P.O. Box 11094
Zephyr Cove, NE 89448